**LINDEMANN PROPERTIES,
LTD., Appellant**

v.

Ward A. CAMPBELL, Appellee

NO. 02-15-00392-CV

Court of Appeals of Texas,
Fort Worth.

DELIVERED: June 22, 2017

874

ATTORNEYS FOR APPELLANT: RUSSELL R. BARTON, ROLAND K. JOHNSON, SHELBY J. WHITE; HARRIS, FINLEY & BOGLE, P.C., FORT WORTH, TEXAS.

ATTORNEY FOR APPELLEE: JEFF MCKNIGHT, WICHITA FALLS, TEXAS.

PANEL: WALKER, MEIER, and SUDDERTH, JJ.

## OPINION ON REHEARING

BILL MEIER, JUSTICE

Appellant Lindemann Properties, Ltd. filed a motion for rehearing and a motion for en banc reconsideration of our opinion that issued on December 8, 2016. We deny both motions, withdraw our opinion and judgment dated December 8, 2016, and substitute the following.

### I. INTRODUCTION

Lindemann sued Appellee Ward A. Campbell for a declaration that Campbell's radio-transmission-tower easement terminated when he removed the original tower and replaced it with a new one. The trial court ultimately signed a take-nothing judgment in favor Campbell, concluding that the easement had not terminated, and awarded him attorney's fees. In what we construe as three issues, Lindemann challenges the trial court's findings and conclusions regarding the easement, the denial of its related request for injunctive relief, and the award of attorney's fees. We will affirm in part and reverse and remand in part.

### II. BACKGROUND

On March 7, 1977, Howell E. Smith d/b/a Muleshoe Cattle Company granted, sold, and conveyed to Campbell's father, A.O. Campbell, Jr., "an easement or right for the installation of a radio-transmission tower, consisting of the tower itself and guy wires as necessary to support the same." The easement expressly granted the following rights:

Together with the right of ingress and egress over my adjacent lands to or from said easement for the purpose of inspecting, maintaining, constructing and removing said radio transmission tower and appurtenances.

TO HAVE AND TO HOLD the above described easement and rights unto the

said A.O. Campbell, Jr., his successors and assigns, perpetually, until said radio transmission tower shall be abandoned and/or removed.

The easement did not specify the tower's height or size, but it stated the following regarding its location:

Said radio transmission tower will be located on a tract 500 feet by 500 feet, the center of which to be determined by the actual location when installed on the following tract of land located in the County of Archer, State of Texas, to-wit:

Situated on Lot No. One (1), Block No. Seventy-five (75) ATNC Subdivision, Archer County, Texas.

Grantor recognizes that the general location as above described is based on a preliminary survey only and hereby agrees the easement hereby granted shall apply to the actual location of said radio transmission tower when located.

The original tower was built in 1977 on the Archer County property referenced in the easement (the "Property"). It measured 400 feet tall and 18 inches wide, it used 1.5 gauge tubing and multiple guy wires, and it was serviced by a small building located directly adjacent to its base. A pipe fence was constructed around the original tower and the small building.

When the original tower was completed, Campbell's father's company, Haigood and Campbell, used it to facilitate two-way radio transmissions between a fleet of vehicles. Over the ensuing years, Haigood and Campbell allowed a number of tenants to mount "a dish or an antenna or something" on the tower for their own broadcast purposes, including the Archer County Sheriff's Department, the Archer County Volunteer Fire Department, Jenson Well Service, Bridwell Oil Company, Burns Operating, Motorola Communications, and SkyBeam Texas. Some paid rent; some did not.

Campbell, a successor-in-interest under the easement contract, became responsible for the original tower in 1990. Although he had it painted, its lightbulbs changed, and its guy wires inspected and tightened, he never had a structural analysis of the tower performed, including before several of the tenants began using it.

Lindemann, a family limited partnership formed in 2009, owns the Property on which the easement is located. The Property was burdened by the easement when the Lindemann family acquired it in 1983.

In early November 2011, Campbell was contacted by Chris Mayo at Site Property Company (SPC), a broker who was working on behalf of LKCM Radio Group, L.P. to find a location for LKCM's broadcasting equipment. After some initial communications about the tower and LKCM's requirements, SPC hired an engineer to perform a structural analysis of the tower to determine whether it could support the additional proposed loading. The results indicated that it would not; the tower was overloaded and in "terrible" condition. SPC then requested a structural report for the existing loads on the tower, hoping to use it to negotiate favorable terms for a potential "drop & swap," a procedure in which an existing tower is removed and replaced with "an equivalent tower as far as configuration and height but meeting current standards." The report indicated that the tower was not in compliance with the International Building Code; noted that "during the field mapping, the tower mast was observed to be visually 'snaking' with significant frame bending around each guy pull-off level above elev. 200ft"; and recommended that the tower be replaced "since the strengthening modifications required [were] too extensive and not feasible."

Campbell did not remedy any of the tower's structural issues after obtaining

the engineering report, and it continued in operation. However, soon thereafter, in early 2012, Campbell began soliciting bids for the construction of a new tower and negotiating a lease with LKCM to install its broadcasting equipment on the new tower. In April 2012, Campbell and LKCM entered into a lease agreement involving a new tower, and in June 2012, Campbell accepted a quote for the construction of a new tower.[1]

Construction on the new tower began in October 2012 and concluded on or about November 8, 2012. The new tower stands 420 feet tall, measures 36 inches wide at its widest point, uses 2.5 gauge tubing, and is located within the same pipe fence that was originally constructed to enclose the original tower and small building. Whereas the original tower used six guy-wire anchors, the new tower uses only three, and the wires are located closer to the tower's base. As was the original tower, the new tower is serviced by a small building located directly adjacent to its base.

The original tower remained in place and in operation while the new tower was being constructed. Thus, although the new tower is located within the same pipe fence as the original tower, it is not located in the exact same location as the original tower. The following image shows the location of the new tower (on the right) in relation to where the original tower stood (on the left):

1. LKCM's engineers consulted on the design of the new tower. Campbell agreed that construction on the new tower would not have begun until LKCM's engineers approved its design.

LP00110

Campbell hired Gordon Parkey to construct the new tower and to remove the original tower. According to Parkey, the new tower "went live" on November 14, 2012. Around the same time, Parkey also told Tim Lindemann, Lindemann's representative, that a single antenna continued to operate on the original tower and that he would not transfer it to the new tower until he returned from performing another job and taking a trip to Colorado. Parkey's absence consequently "drug the time frame out of how long" both towers stood—and apparently operated—simultaneously. Parkey deconstructed and removed the original tower sometime in December 2012.

Lindemann sued Campbell in April 2013 and sought a declaration that the easement had terminated, a permanent mandatory injunction ordering Campbell to remove the new tower and all appurtenances

thereto, and attorney's fees. During the bench trial that ensued, Tim Lindemann testified that the easement had terminated because Campbell had built a new tower, abandoned the original tower, removed the original tower, and simultaneously used both the original and new towers. Campbell agreed that the easement provides for the installation of a single radio-transmission tower, but he opined that his right to maintain the tower allowed him to remove the original tower and to construct the new one. The trial court sided with Campbell. It signed a final judgment that Lindemann take nothing on its claims and awarded Campbell attorney's fees through trial in the amount of $56,106.19 and conditional appellate attorney's fees. The trial court entered the following findings of fact, among others:

13. The Original Tower remained standing until it was replaced and removed in 2012 due to evidence of structural instability.

. . . .

16. Replacement of the Original Tower was necessary to maintain a functional tower in the Tract.

17. The Original Tower was removed after it was replaced by the New Tower.

18. The Original Tower was removed as soon as was practicable after all transmission equipment was relocated to the New Tower.

19. The Original Tower was removed only after it was no longer transmitting.

20. The New Tower does not increase the burden on the surface estate.

21. The New Tower does not exceed the scope of the Easement.

22. The building of the New Tower does not effect a termination of the Easement.

23. No actions of [Campbell] in connection with the maintenance of the Easement effected a termination of the Easement.

24. The Easement has not terminated and is still in existence.

The trial court entered the following conclusions of law, among others:

7. The New Tower does not increase the burden on the surface estate.

8. The New Tower does not exceed the scope of the Easement.

9. The building of the New Tower does not effect a termination of the Easement.

. . . .

11. [Campbell's] right to maintain included his right to replace the Original Tower with the New Tower.

12. The removal of the Original Tower after replacement with the New Tower does not effect a termination of the Easement.

13. The Original Tower was not abandoned; it was replaced.

14. No actions of Campbell in connection with the maintenance of the Easement effected a termination of the Easement.

15. The Easement has not terminated and is still in existence.

### III. EASEMENT TERMINATION

Lindemann argues in its first issue that the easement automatically terminated when Campbell either removed or abandoned the original tower. It contends that the plain terms of the easement authorized the placement of only a single radio-transmission tower on the Property, that the parties to the easement objectively intended that it would terminate upon the original tower's removal or abandonment, and that the evidence conclusively demonstrates that Campbell removed or abandoned the original tower. Lindemann also disputes the trial court's decision to construe the term "maintaining," as it is used in the easement, to include the right to

remove the original tower and to replace it with a new one. Alternatively, Lindemann contends that the easement terminated because Campbell improperly exceeded its scope.

Campbell responds that the right to maintain the original tower includes the right to replace it when necessary and that the new tower did not exceed the easement's scope.

## A. Standards of Review

A trial court's findings of fact have the same force and dignity as a jury's answers to jury questions and are reviewable for legal and factual sufficiency of the evidence to support them by the same standards. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994); *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991); *see also MBM Fin. Corp. v. Woodlands Operating Co.*, 292 S.W.3d 660, 663 n.3 (Tex. 2009). We may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. *Ford Motor Co. v. Castillo*, 444 S.W.3d 616, 620 (Tex. 2014); *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040, 119 S.Ct. 1336, 143 L.Ed.2d 500 (1999). When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965). We defer to unchallenged findings of fact that are supported by some evidence. *Tenaska Energy, Inc. v. Ponderosa Pine Energy, LLC*, 437 S.W.3d 518, 523 (Tex. 2014).

We may review conclusions of law to determine their correctness based upon the facts, but we will not reverse because of an erroneous conclusion if the trial court rendered the proper judgment. *City of Austin v. Whittington*, 384 S.W.3d 766, 779 n.10 (Tex. 2012) (citing *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002)); *H.E.B., L.L.C. v. Ardinger*, 369 S.W.3d 496, 513 (Tex. App.—Fort Worth 2012, no pet.).

## B. Express Easements and Construction

An easement is a nonpossessory interest that authorizes a holder's use of property for only a particular purpose. *Marcus Cable Assocs., L.P. v. Krohn*, 90 S.W.3d 697, 700 (Tex. 2002). The easement holder's rights are limited to those that are expressed in the grant. *DeWitt Cty. Elec. Coop., Inc. v. Parks*, 1 S.W.3d 96, 103 (Tex. 1999). It follows that we apply basic principles of contract construction and interpretation when considering an express easement's terms. *Marcus Cable*, 90 S.W.3d at 700. We give the terms their plain and ordinary meaning when they are not expressly defined, and we read the terms of an easement as a whole to determine the parties' intentions and to carry out the purpose for which the easement was created. *Id.* at 701; *DeWitt Cty. Elec. Coop.*, 1 S.W.3d at 101. We assume that the parties intended for every clause to have some effect. *Koelsch v. Indus. Gas Supply Corp.*, 132 S.W.3d 494, 498 (Tex. App.—Houston [1st Dist.] 2004, pet. denied).

## C. We Cannot Construe Only Some Terms

Referring to the easement's use of the terms "a" and "said," Lindemann argues that "[b]y its plain terms, the Easement only authorized the placement of a single tower on the Property"—the original tower. We certainly agree that the words "a" and "said" are singular, but the problem with Lindemann's construction is that it focuses exclusively on the meaning and effect of only *those* terms while completely disregarding the meaning and effect of *other*, potentially relevant terms. Lindemann's contention that the easement "automatically terminated upon removal or abandonment of the Original Tower" is similarly premised upon a reading of only *part* of the easement contract (the habendum clause). This erroneous approach patently conflicts with the well-established requirements that we examine contracts as a whole and assume that the parties intended for every clause to have some effect—indispensable rules that have been a component of our contract-construction standards for decades. *See, e.g., Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983) ("No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument."); *Citizens Nat'l Bank in Abilene v. Tex. & Pac. Ry. Co.*, 136 Tex. 333, 338, 150 S.W.2d 1003, 1006 ("It is not usually proper to consider a single paragraph, clause, or provision by itself, to ascertain its meaning. To the contrary, each and every part of the contract must be construed and considered with every other part...."), *cert. denied*, 314 U.S. 656, 62 S.Ct. 109, 86 L.Ed. 526 (1941). Of course, this begs the question whether the easement contract contains any terms that must be considered in addition to the terms "a," "said," and "abandoned and/or removed." It does—"maintaining."

## D. "Maintaining" Includes Replacement When Necessary

■ If the facts of this case were that Campbell had removed the original tower and done nothing else, then Lindemann's simple argument that the easement terminated pursuant to the habendum clause would control the outcome. But the facts are not that clear-cut, nor is the analysis. Not only did Campbell remove the original tower—something the ingress/egress clause expressly permitted—he also constructed a replacement tower within the same fenced area that enclosed the original tower. The question then is whether the easement afforded Campbell the right to replace the original tower with the new tower. *See DeWitt Cty. Elec. Coop.*, 1 S.W.3d at 103. The easement expressly grants the holder the right to "maintain[ ]" the radio-transmission tower. We are not the first court to consider whether the term "maintain," as used in an easement contract, may include the right to replace.

In *Houston Pipe Line Co. v. Dwyer*, Dwyer sought a declaration that a pipeline easement across her land had terminated because Houston Pipe Line had removed an eighteen-inch low pressure pipeline and replaced it with a thirty-inch high pressure pipeline. 374 S.W.2d 662, 663 (Tex. 1964). The easement's granting clause originally gave the easement holder the right "to lay, maintain, operate, repair and remove a Pipe Line for the transportation of gas," but the words "and remove" were struck, although a different part of the instrument authorized removal upon termination of the easement. *Id.* Dwyer argued that as changed, the easement "authorized the construction, maintenance, operation and repair of one pipeline only, and did not authorize its replacement or removal except upon termination of the easement as provided in the habendum clause." *Id.* at 664. Houston Pipe Line countered that

even after deleting the term "and remove," the remaining terms were "consistent with the right to remove and replace the original pipe when conditions make it necessary." *Id.* The supreme court agreed with Houston Pipe Line, reasoning in part,

> If plaintiffs are correct in their contention, then defendant's rights and easement under the 1926 agreement would terminate simply by removing and replacing the original pipe, *regardless of its condition*, with pipe of any size. The agreement in question does not compel such an unreasonable result. We hold that the terms 'operate' and 'maintain' in the granting clause are at least broad enough to include the right to remove and replace the original pipe with pipe of the same size *when necessary.*

*Id.* (emphases added). The supreme court thus held that if the condition of a pipeline easement is such that in order to maintain it, replacement is necessary, then the term "maintain," as expressly used in the easement, was broad enough to include removal and replacement.

Lindemann's arguments are indistinguishable from Dwyer's. Like the supreme court, we decline to unreasonably construe the term "maintain[ ]" without any regard for the condition of the easement. We therefore review the evidence to determine whether the condition of the original tower rendered its removal and replacement necessary. *See id.*

■ The original tower was approximately thirty-five years old and in very poor condition when it was removed and replaced. Further, although the structural analysis that SPC had an engineer perform in December 2011 was not for the specific purpose of assessing the original tower's condition, the tests nonetheless revealed that it had numerous structural issues, including snaking of the mast and frame bending around the guy wires. Indeed, the original tower was designated a "Class II" tower, but it could not even pass the test for a "Class I" tower without some manipulation of the data.[2] The engineer recommended that the original tower be replaced:

> Q. Based on your analysis, correct me if I'm wrong, but you do not find any way in which the tower that you did the analysis on could be beefed up, fixed to where it wouldn't—where you didn't have these failures, correct?
>
> A. We stated such.
>
> Q. Okay. So in your professional opinion, the only appropriate remedy for this tower was a replacement?
>
> A. Correct.

On rehearing, Lindemann directs us to evidence that replacement was unnecessary, but under our standards of review, the evidence demonstrating necessity is neither legally nor factually insufficient simply because the record contains some contrary evidence.

Citing public policy that a wrongdoer should not benefit from his wrongdoing, Lindemann argues that the evidence is conclusive that Campbell failed to inspect and maintain the structural integrity of the original tower and, therefore, that his own "misconduct" did not create a necessity warranting removal and replacement of the original tower. The public policy on which Lindemann relies is completely inapposite because there is no evidence that Campbell intentionally, illegally, or fraudulently overloaded the original tower for the purpose of creating a necessity to justify its removal and replacement. *See Kulubis v. Tex. Farm Bureau Underwriters Ins. Co.*, 706 S.W.2d 953, 954-55 (Tex. 1986)

---

**2.** A structural Class II "translates back to a 50-year recurrence on the environmental loading criteria, which is the wind and so on," while a structural Class I "translates to a 25-year wind return period."

(disavowing rule that illegal or fraudulent acts by one co-insured prevented recovery under insurance policy by the other co-insured). Campbell acknowledged that he did not have the original tower inspected, but he also testified that he performed some maintenance of the original tower (by having it painted, its lightbulbs changed, and its guy wires tightened); that he was never made aware of anything regarding the original tower's condition that caused him any concern; and that after receiving the engineering report in December 2011, he "moved as fast as [he] could move" to address the issues that it raised. In light of this and the entire record, we cannot agree that Campbell's behavior over the years warrants application of the above policy.

■ Lindemann also argues that by implying the right to replace the original tower into the meaning of "maintaining" and then authorizing the original tower to be removed if it was being replaced, the trial court "rendered the plain and unqualified meaning of both of the terminating events meaningless" and "effectively rewrote the habendum clause to add an exception or limitation." The trial court's construction did neither. "When provisions in an agreement appear to be in conflict, the court should examine and consider the entire writing, seeking to harmonize and reconcile the conflicting provisions to the greatest extent possible." *Derr Constr. Co. v. City of Hous.*, 846 S.W.2d 854, 862 (Tex. App.—Houston [14th Dist.] 1992, no writ). If the tower is removed and replaced—because to maintain the tower, its condition rendered removal and replacement necessary—the terminating clause is simply not triggered because the easement holder merely exercised his rights to remove and maintain the tower as expressly granted by the ingress-egress clause. However, if the tower is removed and not replaced, or removed and replaced when it was not necessary to maintain the tower,

then the habendum clause is triggered. The easement's terms are thus reconcilable, and the terminating events continue to have meaning, even without the purported improper addition of any language thereto.

■ Lindemann further contends that the plain meaning of "replace"—"to take the place of[,] esp. as a substitute or successor"—contradicts the plain meaning of "maintain"—"to keep in an existing state (as of repair, efficiency, or validity)." It argues that while the easement holder may maintain the tower by replacing its *parts*, " 'maintaining' cannot mean intentionally removing and replacing the *entire* Original Tower because it would be the opposite of preserving the existing condition of the Original Tower." [Emphasis added.] Lindemann disregards a well-established standard for construing easements—one that the supreme court expressly evoked in *Dwyer*. An easement "carries with it the right to do such things as are *reasonably necessary* for the full enjoyment of the easement," *Cent. Power & Light Co. v. Holloway*, 431 S.W.2d 436, 439 (Tex. Civ. App.—Corpus Christi 1968, no writ) (emphasis added), although it cannot be forgotten that the rights reasonably necessary for full enjoyment "do not encompass rights foreign to the purpose for which the easement is granted." *State v. Brownlow*, 319 S.W.3d 649, 656 (Tex. 2010). As explained, the supreme court in *Dwyer* concluded that it would be *unreasonable* not to consider the condition of the pipeline when determining whether the term "maintain," which was expressly included in the easement, was broad enough to include removal and replacement. 374 S.W.2d at 664. The supreme court did so because, simply enough, a pipeline may be in such a condition that replacement is necessary to maintain it. The same holds true for the radio-transmission tower here. Construing the term "maintaining" to al-

low replacement of only parts of the tower, but not the entire tower when necessary, is unreasonable and could effectively preclude Campbell from fully enjoying the easement.

Lindemann also seeks to factually distinguish *Dwyer* by arguing that unlike the easement in this case, the easement there "did not expressly state that [it] would terminate upon removal of the pipeline"; "[t]he *Dwyer* court simply would not have implied a right to remove and replace had the agreement expressly said that removal would terminate the easement." Lindemann is concerned, it appears, that implying a right to remove and replace would conflict with the habendum clause's own removal provision. But we do not imply any right to remove; the ingress/egress clause, as written, expressly permits Campbell to remove the original tower. We rely on *Dwyer* only insofar as it pertains to *replacement*. If there is any potential conflict between the removal provisions contained in the ingress/egress and habendum clauses, not only was it pre-existing, but harmonization is necessarily achieved by construing the term "maintaining" to permit replacement when necessary, as explained above.

▮ Finally, even if removal and replacement did not trigger termination, the easement alternatively provides for termination in the event of abandonment. Lindemann argues that the evidence conclusively proved that Campbell abandoned the original tower. We may properly treat the trial court's conclusion of law number 13—"The Original Tower was not abandoned; it was replaced"—as a finding of fact. *See Ray v. Farmers' State Bank of Hart*, 576 S.W.2d 607, 608 n.1 (Tex. 1979) ("Although this finding appears among the conclusions of law, the designation is not controlling and we may treat it as a finding of fact."). As alluded to, Campbell exercised his right under the ingress/egress clause to perform a necessary removal and replacement of the original tower. In doing so, he did not simultaneously trigger the habendum clause's abandonment clause. Indeed, "abandon" means "to cease to assert or exercise an interest, right, or title to[,] esp. with the intent of never again resuming or reasserting it." Webster's Third New Int'l Dictionary 2 (2002). Campbell has done precisely the opposite since 1977; he replaced the original tower and has persisted to this day in asserting and protecting his rights afforded to him under the easement contract. Lindemann argues on rehearing that Campbell "admitted that he abandoned the Original Tower" because he testified that he "ceased" using the original tower, but as the factfinder, the trial court could have reasonably inferred that Campbell ceased using the original tower because he replaced it with the new tower, not because he abandoned the original tower. *See City of Keller v. Wilson*, 168 S.W.3d 802, 821 (Tex. 2005) (requiring courts to resolve conflicting inferences in favor of the verdict if reasonable minds could).

We conclude and hold that the term "maintaining," as used in the easement, is broad enough to include the right to replace the tower when necessary; that the evidence is both legally and factually sufficient to show that the original tower's replacement was necessary; and that the easement did not terminate when Campbell removed the original tower and replaced it with the new tower. *See id.*; *see also Marcus Cable*, 90 S.W.3d at 700. The evidence is therefore legally and factually sufficient to support the trial court's findings of fact 13, 16, 22, 23, 24 and conclusion of law 13; and conclusions of law 9, 11, 12, and 14 are not erroneous. *See Ford Motor Co.*, 444 S.W.3d at 620; *Pool*, 715 S.W.2d at 635. We overrule this part of Lindemann's first issue.

### E. Scope of Easement

 In the other part of what we construe as its first issue, Lindemann argues that even if Campbell had the right to replace the original tower, the easement nevertheless terminated because Campbell exceeded its scope by moving the location of the new tower, by constructing a substantially larger new tower, and by operating both towers simultaneously. Lindemann finds its support in the second half of *Dwyer'* s analysis, in which the supreme court considered whether Houston Pipe Line could replace the original eighteen-inch pipeline with a substantially larger thirty-inch pipeline. *See* 374 S.W.2d at 664-66. The supreme court reasoned that because the easement contained no limitation on the size of the pipeline, "when [Houston Pipe Line] constructed its 18-inch pipeline with the consent and acquiescence of [Dwyer], the extent of [Houston Pipe Line's] easement rights under the 1926 agreement became fixed and certain." *Id.* at 666. Consequently, Houston Pipe Line "was not authorized to remove th[e] 18-inch line initially constructed and replace it with a line of substantially greater size." *Id.* Lindemann employs the same rationale here—the easement did not specify the height, the size, or the precise location of the radio-transmission tower, so when Campbell's predecessor constructed the original tower, those terms became fixed, and when Campbell constructed the new tower, which deviated from those fixed terms, he improperly exceeded the easement's scope.

In our original opinion, we followed Lindemann's lead and assumed that *Dwyer* controlled the analysis. Upon further reflection on rehearing, we conclude that the second half of *Dwyer'* s analysis is inapposite under the facts of this case.

In *Dwyer*, the supreme court was principally concerned not with the mere fact that Houston Pipe Line increased the width of its pipeline but rather with *the effect* that increasing the size of the pipeline had on the easement's boundaries and limits. Specifically, the easement did "not prescribe metes and bounds for the easement, nor d[id] it define a course or direction for the pipe to follow across the land." *Id.* at 663. Therefore, "the extent of defendant's easement rights under the 1926 agreement became fixed and certain" when the original eighteen-inch pipeline was constructed. *Id.* at 666. Consequently, when Houston Pipe Line replaced the old eighteen-inch pipeline with the new thirty-inch pipeline, that action necessarily had the corresponding effect of "*widening* the ditch as well as placing the pipe approximately two feet *deeper* than it was in the original ditch," which, naturally, caused the easement's previously determined boundaries to increase in size. *Id.* at 665 (emphases added).

Here, compared to the original tower, the new tower stands 20 feet taller (420 feet compared to 400 feet), is twice as wide (36 inches compared to 18 inches), and uses larger tubing (2.5 gauge compared to 1.5 gauge). However, unlike the increase in the pipeline's width in *Dwyer*, which effectively enlarged the easement, the new tower's increase in height, width, and tubing size had no effect whatsoever on the easement tract's 500' x 500' boundaries. *Dwyer* does not control here. Cf. *Lower Colo. River Auth. v. Ashby*, 530 S.W.2d 628, 632 (Tex. Civ. App.—Austin 1975, writ ref'd n.r.e.) ("The easement is then designated as a strip of land 100 feet wide following a course through appellee's land described by metes and bounds.... None of the vagueness and indefiniteness of the easement in *Dwyer* is present here.").

Under the easement, the location of the original tower fixed the center point for determining the location of the 500' x 500' easement tract. Lindemann argues that by constructing the new tower eighteen feet from the original tower's location, Camp-

bell changed the center point of the 500' x 500' easement tract and, therefore, the location of the entire easement. Lindemann contends that Campbell should have first removed the original tower and then constructed the new tower in the exact same location. Lindemann is concerned that if Campbell was not required to construct the new tower in the exact same location as the original tower, then he could "continually erect 'replacement' towers in new locations, every one of which will change the location of the easement."

The easement tract is located on a hilltop. The new tower is located approximately eighteen feet from where the original tower stood. Aside from grass and mesquite trees, the only other physical objects in the area are electric poles and wires and some oil field remanents. Tim Lindemann acknowledged that the construction of the new tower caused no change in Lindemann's day-to-day operations. Lindemann is concerned that a surveyor may be confused at some point in the future because the 500' x 500' easement tract shifted approximately eighteen feet when the new tower was constructed, but considering these facts and the extent of the record, we cannot conclude that relocation was in any way substantial. *See Herren v. Pettengill*, 273 Ga. 122, 538 S.E.2d 735, 736 (2000) ("The majority rule in the United States is that an easement with a fixed location cannot be substantially changed or relocated without the express or implied consent of the owners of both the servient estate and the dominant estate...."); *Umberger v. State ex rel. Dep't of Game, Fish & Parks*, 248 N.W.2d 395, 397 (S.D. 1976) ("It has long been the general view that where an easement is acquired by grant in a given location in the servient tenement it becomes fixed by specific designation from a mutual agreement, or by usage and acquiescence. Its location

may not be substantially changed by any one party without the consent of the other."); *Youngstown Steel Prods. Co. of Cal. v. City of Los Angeles*, 38 Cal.2d 407, 240 P.2d 977, 979 (1952) ("Once the location of an easement has been finally established, whether by express terms of the grant or by use and acquiescence, it cannot be substantially changed without the consent of both parties."); *see also McGoey v. Brace*, 395 Ill.App.3d 847, 335 Ill.Dec. 214, 918 N.E.2d 559, 563-64 (2009) (discussing Illinois's substantiality standard for relocating easements).

Even more so, in *Harris v. Phillips Pipe Line Co.*, the court of appeals agreed with the trial court that Phillips had acted within the terms of its easement when it replaced and relocated a pipeline parallel to and fifteen feet away from its original location. 517 S.W.2d 361, 363-65 (Tex. Civ. App.—Austin 1974, writ ref'd n.r.e.). Phillips relocated the new pipeline because construction would have been hazardous at any less distance from the old pipeline, which remained in operation during the construction of the new pipeline. *Id.* at 363. The evidence showed that if Phillips had shut down the old pipeline, it would have been required to shut down its refinery, 20 gasoline plants, and more than 200 gas wells that supplied the plants. *Id.* In light of those facts, the court of appeals reasoned that "[t]o require Phillips to cease use of the pipe line in order to replace it with a new line would deny Phillips a right expressly given by the grant, the right to use, maintain, and operate the pipe line." *Id.* at 364-65.

Campbell proceeded just like Phillips did with its easement in *Harris*. Constructing the new tower less than twenty feet from the original tower allowed Campbell's tenants to continue to broadcast uninterrupted during the new tower's construction.[3] Although permitting the

3. Tim Lindemann agreed that it was not phys-

ically possible to build the new tower in the

original tower to continue to operate while the new tower was being constructed did not avoid a three-month shut down of numerous gasoline plants and gas wells, it did involve a potentially more important purpose: the safety and welfare of the residents of Archer County. Both the Archer County Sheriff's Department and the Archer County Volunteer Fire Department utilized the original tower for radio communications. There can be no doubt that requiring Campbell to remove the original tower so that the new tower could be constructed in the exact same location would have required these public-service entities to find an alternative broadcast location for at least some period of time. The potential disruption in these vital services is more than enough reason to justify locating the new tower less than twenty feet away from the original tower so that these tenants could continue to broadcast uninterrupted during the new tower's construction. Campbell's attorney made this important point during his cross-examination of Tim Lindemann:

Q. Do you believe that the Archer County Sheriff's Department and the Archer County Volunteer Fire Department's ability to transmit is important for public safety?

A. Yes.

Q. And would you agree with me that that is of such importance that it could be a factor in the method and manner in which you handle those two transmission attempts, correct?

A. Be more specific. Am I handling the antennas now?

Q. Let me back up. With that importance to public safety, it would be a very significant important factor in the way that a person, a reasonable person would handle those two antennas when dealing with this tower, correct?

A. I'm sorry. I still don't understand what you're asking.

Q. I think my point is made.

As for Lindemann's contention that Campbell exceeded the easement's scope by operating both towers simultaneously, the evidence showed that the lone antenna that remained operating on the original tower during Parkey's absence from the jobsite belonged to "one of the Archer County services tenants." Our reasoning immediately above is therefore equally applicable here. The uninterrupted operation of the public-service entities' radio transmissions justified the relatively brief but simultaneous operation of both towers.

The easement did not terminate because Campbell did not exceed its scope. The evidence is legally and factually sufficient to support the trial court's findings of fact 21 and 24, and conclusions of law 8 and 15 are not erroneous. *See Ford Motor Co.*, 444 S.W.3d at 620; *Pool*, 715 S.W.2d at 635. We overrule the remainder of Lindemann's first issue.

**F. Response to the Dissent**

Relying on the easement's terms "a" and "said," the dissent first contends that the only reasonable construction of the easement is that it permitted the placement of one radio transmission only—the tower that was built in 1977. Notwithstanding that this result is reached by construing only some of the easement's terms, the supreme court rejected the very same argument over fifty years ago when it construed a pipeline easement that permitted the installation of only "a" pipeline but that also granted its holder the right to "maintain" and to "operate" the pipeline— much like the easement here. *See Dwyer*, 374 S.W.2d at 664 ("[Respondents] contend that the agreement ... authorized the construction, maintenance, operation and re-

exact same location of the original tower

while the original tower was still standing.

pair *of one pipeline only, and did not authorize its replacement or removal except upon termination of the easement as provided in the habendum clause."* (emphasis added)). The supreme court held that it would be *unreasonable* to simply conclude—just like the dissent does here—that the easement terminated upon the pipeline's removal and replacement without additionally considering whether the pipeline was in such a condition that its removal and replacement was necessary to "maintain" it. *Id.* at 664. Thus, the only reasonable construction of the easement is the majority's, not the dissent's. *See Plains Expl. & Prod. Co. v. Torch Energy Advisors Inc.*, 473 S.W.3d 296, 305 (Tex. 2015) ("We 'construe contracts from a utilitarian standpoint bearing in mind the particular business activity sought to be served,' and avoiding unreasonable constructions when possible and proper.").

The dissent next argues that our construction of the easement "eviscerates the habendum clause and its specific language making the Easement determinable and rewrites the Easement to make it perpetual," but as we already explained, the habendum clause's termination provision continues to have meaning when the tower is removed and not replaced or when the tower is removed and replaced when it was not necessary to maintain the tower.

Finally, the dissent contends that insofar as *Dwyer* may be construed to authorize replacement for maintenance, it held that the object to be removed must be replaced with another object of the "same size." But the appropriate inquiry focuses on the replaced object's effect on the easement's boundaries, if any, not on the mere increase in the replaced object's size. *See Dwyer*, 374 S.W.2d at 665-66.

## IV. INJUNCTIVE RELIEF

In its second issue, Lindemann argues that because the trial court erred in con-cluding that the easement did not terminate, it also abused its discretion by failing to grant Lindemann's request for permanent injunctive relief. Because Lindemann's first issue challenging the trial court's findings and conclusions regarding the easement's termination was unpersuasive, this contingent issue seeking injunctive relief is also unpersuasive. We overrule Lindemann's second issue.

## V. ATTORNEY'S FEES

Lindemann's third and final issue challenges the trial court's award of attorney's fees to Campbell. Lindemann first contends that reversal is required because it was entitled to judgment on its declaratory-judgment claim, and the trial court clearly intended to award attorney's fees to the prevailing party. Having overruled Lindemann's first issue, we overrule this part of its third issue.

In the other part of its third issue, Lindemann argues that the trial court abused its discretion by awarding unsegregated attorney's fees. Lindemann maintains that some portion of Campbell's attorney's services were directed towards the defense of Lindemann's trespass claim—e.g., "extensive portions of Tim Lindemann's deposition were focused solely on potential monetary damages, which relate only to the trespass claim"—and that fees are not recoverable for trespass. More importantly, Lindemann challenges the trial court's conclusion of law 6, which provides that the fees incurred in defending Lindemann's trespass claim were intertwined with the fees incurred in defending against Lindemann's declaratory-judgment claim insofar as they relate to Campbell's contention that the new tower did not increase the burden on Lindemann's surface estate:

6. Necessary legal services performed for Defendant on Lindemann's trespass claim are indistinguishable

from necessary legal services performed for Defendant to create and sustain its arguments *regarding the surface burden* of the Original and New Towers. [Emphasis added.]

Campbell directs us to conclusion of law 6 and responds that the trial court acted within its discretion to award unsegregated attorney's fees.

We have previously set out the standards for fees segregation:

Parties seeking attorney's fees under Texas law "have always been required to segregate fees between claims for which they are recoverable and claims for which they are not." *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 311 (Tex. 2006). The supreme court recognized an exception to this rule in *Stewart Title Guaranty Co. v. Sterling*: attorney's fees need not be segregated when "the fees rendered are in connection with claims arising out of the same transaction and are so interrelated that their prosecution or defense entails proof or denial of essentially the same facts." 822 S.W.2d 1, 11-12 (Tex. 1991). But in *Chapa*, the supreme court held that "[t]o the extent *Sterling* suggested that a common set of underlying facts necessarily made all claims arising therefrom 'inseparable' and all legal fees recoverable, it went too far" and flooded the courts of appeals with claims that recoverable and unrecoverable fees are inextricably intertwined. 212 S.W.3d at 312. The supreme court therefore held as follows:

Accordingly, we reaffirm the rule that if any attorney's fees relate solely to a claim for which such fees are unrecoverable, a claimant must segregate recoverable from unrecoverable fees. In-

tertwined facts do not make tort fees recoverable; *it is only when discrete legal services advance both a recoverable and unrecoverable claim that they are so intertwined that they need not be segregated.* We modify *Sterling* to that extent.

*Id.* at 313-14 (emphasis added).

*AMX Enters., L.L.P. v. Master Realty Corp.*, 283 S.W.3d 506, 521 (Tex. App.—Fort Worth 2009, no pet.) (op. on reh'g).

█ As Lindemann observed in another part of its brief, the supreme court has reasoned that "the threshold inquiry [in construing an easement] is not whether the proposed use results in a material burden, but whether the grant's terms authorize the proposed use." *Marcus Cable*, 90 S.W.3d at 703. This is because "if a use does not serve the easement's express purpose, it becomes an unauthorized presence on the land *whether or not* it results in any noticeable burden to the servient estate." *Id.* (emphasis added). Because the relevant inquiry is whether the easement authorized the use and not whether the servient estate suffered any more or less burden, and because the trial court's conclusion of law 6 is premised upon this very basis, we agree with Lindemann that the fees that Campbell incurred defending against Lindemann's trespass claim did not also advance Campbell's defense to Lindemann's declaratory-judgment claim regarding the easement's construction. We hold that the trial court abused its discretion by awarding Campbell unsegregated attorney's fees, and we sustain this part of Lindemann's third issue.[4]

## VI. Conclusion

Having overruled Lindemann's first and second issues, we affirm the part of the

---

4. When segregation is required, a claimant's failure to segregate fees does not mean that the claimant cannot recover any fees; unsegregated attorney's fees for the entire case

are some evidence of what the segregated amount should be, and remand is required to calculate the segregated award. *Tony Gullo Motors I*, 212 S.W.3d at 314-15.

trial court's judgment ordering that Lindemann take nothing on its claims against Campbell. But having sustained part of Lindemann's third issue, we reverse the part of the trial court's judgment awarding Campbell attorney's fees and remand this cause to the trial court for a new trial on only the issue of attorney's fees.

WALKER, J., filed a dissenting opinion.

SUE WALKER, JUSTICE, dissenting.

## I. INTRODUCTION

By its express terms, the easement at issue here (the Easement), authorized the installation of a single radio-transmission tower and terminated if "said radio transmission tower" was "abandoned and/or removed." Because the Easement here is susceptible to only one reasonable interpretation after applying established rules of contract construction, and because the pertinent facts—that a second, bigger, taller, and wider radio transmission tower was installed on the dominant estate in a new location and the original "said radio transmission tower" was dismantled and destroyed—are conclusively established, I would construe the Easement as a matter of law. In accordance with that construction, I would reverse the trial court's judgment for appellee Ward A. Campbell declaring that the Easement had not terminated and render judgment for appellant Lindemann Properties, Ltd. declaring that the Easement did terminate. *See Marcus Cable Assocs., L.P. v. Krohn,* 90 S.W.3d 697, 703 (Tex. 2002) (explaining that when an easement is susceptible to only one reasonable, definite interpretation after applying established rules of contract construction, we are obligated to construe it as matter of law even if the parties offer different interpretations of the easement's terms). The majority reaches a different conclusion, so I am compelled to dissent.

## II. THE EASEMENT

In 1977, Lindemann's predecessor-in-title to the servient estate granted the Easement to Campbell's predecessor-in-title to the dominant estate. The Easement was granted "for and in consideration of TEN AND NO/100 ($10.00) Dollars." It was limited to granting:

*[A]n easement or right for the installation of **a radio transmission tower**,* consisting of the tower itself and guy wires as necessary to support the same.

***Said radio transmission tower*** will be located on a tract 500 feet by 500 feet, the center of which to be determined by the actual location when installed on the following tract of land located in the County of Archer, State of Texas, to-wit:

Situated on Lot No. One (1), Block No. Seventy-Five (75) ATN Subdivision, Archer County, Texas.

Grantor recognizes that the general location as above described is based on a preliminary survey only *and hereby agrees that the easement hereby granted shall apply to the actual location of **said** radio transmission tower when located.*

Together with the right of ingress and egress over my adjacent lands to or from said easement *for the purpose of inspecting, maintaining, constructing and removing **said radio transmission** tower* and appurtenances.

TO HAVE AND TO HOLD the above described easement and rights unto the said A. O. Campbell, Jr., his successors and assigns, perpetually, *until **said** radio transmission tower shall be abandoned and/or removed.* [Emphases added.]

In accordance with the Easement, a 400-foot tall, 18-inch wide radio transmission tower was built in 1977 on what became the center point of the 500 foot by 500 foot easement.

In 2011, to facilitate a lucrative lease with LKCM Radio Group, L.P. for placement of F.M. radio-broadcasting equipment, Campbell built a new, bigger, taller, and wider radio-transmission tower on the Easement. The new radio tower was constructed out of larger metal tubing and was at least 20 feet taller and 3 feet wider than the old radio tower. After the new radio tower was built 18 feet from the old one, Campbell tore down the old radio tower.

### III. The Lawsuit

Lindemann sued Campbell, seeking a declaration that the Easement had terminated. Following a bench trial, the trial court ruled for Campbell, made findings of fact and conclusions of law,[1] and signed a judgment against Lindemann declaring that the Easement had not terminated. Lindemann perfected this appeal.

The pertinent facts of this appeal are not in dispute.[2] The relief sought by Lindemann, however, pivots on the legal correctness of the trial court's conclusions of law.

### IV. The Law Concerning Easements

A property owner's right to exclude others from his or her property is recognized as " 'one of the most essential sticks in the bundle of rights that are commonly characterized as property.' " *Id.* at 700 (quoting *Dolan v. City of Tigard,* 512 U.S. 374, 384, 114 S.Ct. 2309, 2316, 129 L.Ed.2d 304 (1994)). A landowner may grant an easement that relinquishes a portion of this right to exclude others, but such a relinquishment is limited in nature. *Id.* An easement is a nonpossessory interest that authorizes its holder to use the property for only particular purposes. *Id.; see also Severance v. Patterson,* 370 S.W.3d 705, 721 (Tex. 2012) (recognizing easement allows another to use property for a specific purpose). That is, an easement extends to certain persons the right to use the land of another for a specific purpose. *Corley v. Entergy Corp.,* 246 F.Supp.2d 565, 572 (E.D. Tex. 2003). If a use does not serve an easement's express purpose, that use becomes an unauthorized presence on the land whether or not it results in any noticeable burden to the servient estate; thus, the threshold inquiry is not whether the proposed use results in a material burden but whether the grant's terms authorize the proposed use. *Id.* (citing *Marcus Cable,* 90 S.W.3d at 703).

When the terms used in the grant of an easement are not specifically defined, they should be given their plain, ordinary, and generally accepted meaning. *Marcus Cable,* 90 S.W.3d at 701. An easement's express terms provide the purpose for which the easement holder may use the property. *Id.; see also Canyon Reg'l Water Auth. v. Guadalupe-Blanco River Auth.,* 258 S.W.3d 613, 616 (Tex. 2008) ("The express terms of the easement determine the scope of the easement holder's rights."). Only what is necessary to "fairly enjoy the rights expressly granted" passes by implication because those who grant easements should be assured that their conveyances will not be construed to undermine their private-property rights—like the rights to "exclude others" or to "obtain a profit"—any more than what was intended in the grant. *Marcus Cable,* 90 S.W.3d at 701-02

---

1. A copy of the trial court's findings of fact and conclusions of law is attached hereto as Appendix A.

2. The majority addresses Findings of Fact 13, 16, 22-24 and Conclusions of Law 9, 11, 12, 13, and 14. But Findings of Fact 16, and 22-24 are actually conclusions of law. *See Seasha Pools, Inc. v. Hardister,* 391 S.W.3d 635, 637 (Tex. App.—Austin 2012, no pet.) ("[A] trial court's designation of items as findings of fact or conclusions of law is not controlling on appeal, and we may treat the court's ruling as a factual finding or legal conclusion regardless of the label used.").

(quoting *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 436, 102 S.Ct. 3164, 3176, 73 L.Ed.2d 868 (1982)). That is, in construing an easement, "[i]t is not necessary for [the easement grantor] to make any reservation to protect his interests in the land, for what he does not convey, he still retains." *Id.* (quoting *City of Pasadena v. Calif.-Mich. Land & Water Co.*, 17 Cal.2d 576, 110 P.2d 983, 985 (1941)).

## V. Standards of Review

We review a trial court's conclusions of law de novo to determine whether the trial court drew the correct legal conclusions from the facts. *State v. Heal,* 917 S.W.2d 6, 9 (Tex. 1996). We are not bound by the trial court's conclusions of law and will review them independently to determine their legal correctness. *Am. Flood Research, Inc. v. Jones,* 192 S.W.3d 581, 583 (Tex. 2006).

We likewise review the trial court's interpretation of the easement de novo. *See DeWitt Cty. Elec. Co-op., Inc. v. Parks,* 1 S.W.3d 96, 101 (Tex. 1999); *Eddins Enters., Inc. v. Town of Addison,* 280 S.W.3d 544, 548 (Tex. App.—Dallas 2009, no pet.). The rules of contract construction and interpretation apply to an express easement agreement. *N. Tex. Mun. Water Dist. v. Ball,* 466 S.W.3d 314, 319 (Tex. App.—Dallas 2015, no pet.) (citing *Parks,* 1 S.W.3d at 100).

## VI. Analysis

### A. Scope of the Easement: The Easement Granted the Limited Right to Install a Single Radio-Transmission Tower

The scope of Campbell's rights is determined by the express terms of the Ease-

ment's grant. *Parks,* 1 S.W.3d at 103 ("[T]he scope of the easement holder's rights must be determined by the terms of the grant"). The Easement granted a "right for the installation of $\underline{a}$ radio transmission tower ... [t]ogether with the right of ingress and egress over [Lindemann's] adjacent lands to or from said easement for the purpose of inspecting, maintaining, constructing and removing $\underline{said}$ radio transmission tower and appurtenances." [Emphases added.] Thus, the express terms of the Easement grant a limited, specific use of the dominant estate for the installation and construction of *a* (singular) radio-transmission tower and provide for a limited right of ingress and egress over the servient estate for maintenance and removal of *said* (singular) radio-transmission tower. *See Kearney & Son v. Fancher,* 401 S.W.2d 897, 905 (Tex. Civ. App.—Fort Worth 1966, writ ref'd n.r.e.) (recognizing that because easement specifically stated the use or purpose for which it was created, easement was limited to such use and could not be enlarged); *see also Ybanez v. U.S.,* 98 Fed.Cl. 659, 667-68 (Fed. Cl. 2011) (holding Texas case law dictates that scope of easement be narrowly construed in accordance with its express terms so that original easement granting right-of-way to railroad for railroad-purpose use precluded subsequent use of easement for trails and railbanking and holding action by Surface Transportation Board allowing such use constituted a Fifth Amendment taking because it was beyond the scope of the original easement).[3]

The majority's scope-of-the-easement analysis would be correct if the Easement were a general-purpose easement or if the Easement included language specifically

---

3. The *Ybanez* court relied on three Texas cases for this proposition, which are cited and relied upon herein as well. *See Marcus Cable,* 90 S.W.3d at 707-08; *Kearney & Son,* 401 S.W.2d at 903; *Mo., K. & T. Ry. Co. of Tex. v. Anderson,* 36 Tex. Civ. App. 121, 126-30, 81 S.W. 781, 785-86 (1904, writ ref'd).

authorizing construction of the new, bigger, taller radio transmission tower built in a new location. The scope of a general-purpose easement includes not only the use required at the time of the grant but also the right to use the easement in other ways that are connected to the articulated, general purpose of the easement. *See, e.g., Peterson v. Barron*, 401 S.W.2d 680, 683-84, 686 (Tex. Civ. App.—Dallas 1966, no writ) (holding general-purpose easement to be used for drainage and utilities facilities granting right to "construct, reconstruct and perpetually maintain drainage and utility facilities . . . upon and across the following described property" also included right "not only to install a sanitary sewer line, but also the right to use the area covered by easement for other drainage and utility facilities, including a drainage canal"). But the Easement is not a general-purpose easement; it does not grant a general, radio-transmission right-of-way or a general easement for the operation of a radio-broadcasting network. *Cf. Houston Pipe Line Co. v. Dwyer*, 374 S.W.2d 662, 663, 666 (Tex. 1964) (construing general-purpose easement for transportation of gas by pipeline); *Harris v. Phillips Pipe Line Co.*, 517 S.W.2d 361, 364 (Tex. Civ. App.—Austin 1974, writ ref'd n.r.e.) (construing general-purpose easement to be used for transportation of oil and gas); *Peterson*, 401 S.W.2d at 683-84, 686 (construing general-purpose easement to be used for drainage and utilities facilities). In fact, the Easement does not include the terms "right-of-way" or "operate" or any other terms that would grant to Campbell the right to administer some type of ongoing radio-transmission business on the Easement in excess of "said radio transmission tower." *Cf. Dwyer*, 374 S.W.2d at 666 (construing general-purpose easement granting "a right of way to lay, maintain, operate, repair[,] and remove a Pipe Line for the transportation of gas"); *Harris*, 517 S.W.2d at 362 (construing general-purpose

easement granting "the right of way from time to time to lay, construct, reconstruct, replace, renew, maintain, repair, change the size of and remove pipes and pipe lines for the transportation of oil, petroleum, or any of its products"); *Peterson*, 401 S.W.2d at 683 (construing general-purpose easement granting right to "construct, reconstruct and perpetually maintain drainage and utility facilities"). The Easement could have granted a general-purpose easement for a radio transmission right-of-way or for the operation of a radio-transmission broadcasting system, but it did not. *See, e.g., Corley*, 246 F.Supp.2d at 575 ("The grantor of an easement may limit the grant in any way the grantor chooses, and the grantee takes the easement subject to the restrictions imposed."); *see also Marcus Cable*, 90 S.W.3d at 703-05 (holding easement's grant of right to use property for the purpose of constructing and maintaining an electric transmission or distribution line or system did not authorize use of easement to provide cable-television services); *Kearney & Son*, 401 S.W.2d at 903 (holding easement's grant of "use of railroad switch track and grounds" did not grant access via vehicles or roads and holding easement terminated when railroad was abandoned).

Nor do the terms of the Easement specifically grant the rights Campbell now seeks—to reconstruct, replace, alter, enlarge, move, and change the size of the radio-transmission tower. *Cf. Boland v. Nat. Gas Pipeline Co. of Am.*, 816 S.W.2d 843, 844 (Tex. App.—Fort Worth 1991, no writ) (construing easement granted rights to "construct thereon and to reconstruct, operate, maintain, repair, alter, replace, move[,] and remove an initial pipeline, and any additional pipeline described by Grantee, for the transportation of gas, oil, or other substances transportable by pipeline, at route or routes selected by Grantee") (emphasis removed); *Harris*, 517 S.W.2d at

364 (discussing landowner's grant to Shell Oil as "patently ... very broad" and including "the right to 'construct, reconstruct, replace, renew, maintain, repair, change the size of[,] and remove pipes and pipe lines'"); *Edgcomb v. Lower Valley Power & Light, Inc.*, 922 P.2d 850, 853 (Wyo. 1996) (explaining easement was perpetual and granted right to "construct, reconstruct, rephase, repair, operate[,] and maintain on the above-described lands and/or in or upon all streets, roads[,] or highways abutting said lands, an electric transmission and/or distribution line or system"). Nowhere do the terms of the Easement grant the right to engage in a second construction project to install a second radio-transmission tower on the dominant estate. Nowhere do the terms of the Easement grant the right to build on the dominant estate a new radio-transmission tower, that is bigger, taller, and wider and in a different spot than the original tower.

Despite the fact that the Easement is not a general-purpose easement that encompasses the right to construct a new, bigger, taller radio-transmission tower in a new location, and despite the fact that the Easement does not include language specifically authorizing construction of a new, bigger, taller radio-transmission tower in a new location, the majority holds that even Campbell's simultaneous broadcasting on the original radio-transmission tower and the new tower did not violate the scope of the Easement because the simultaneous broadcasting served "a potentially more important purpose: the safety and welfare of the residents of Archer County."[4] But promoting public safety cannot expand the express terms of a private easement. *See Marcus Cable*, 90 S.W.3d at 704 ("In sum, the easement language here, properly construed, does not permit cable-television lines to be strung across the Krohn's land without their consent. However laudable the goal of extending cable service might be, we cannot disregard the easement's express terms to enlarge its purposes beyond those intended by the contracting parties."); *cf. Harris*, 571 S.W.2d at 364 (holding simultaneous use of new and old pipeline was authorized when the easement was a general-purpose easement for the transportation of oil and gas and when the easement specifically granted "the right of way from time to time to lay, construct, [r]econstruct, replace, renew, maintain, repair, change the size of[,] and remove pipes and pipe lines for the transportation of oil, petroleum, or any of its products").

Instead, the terms of the Easement grant only the limited "right for the installation of *a* radio transmission tower." [Emphasis added.] Thus, the scope of the Easement does not include the right to build a new, bigger, taller, and wider radio-transmission tower in a new location. *See, e.g., Ybanez*, 98 Fed.Cl. at 667–68 (holding that where "a particular purpose is not provided for in the [easement's] grant, a use pursuing that purpose is not allowed" (quoting *Marcus Cable*, 90 S.W.3d at 701–02)); *Kearney & Son*, 401 S.W.2d at 903 (explaining that "[w]here the terms [of easement's granting clause] are specific, they are decisive of the limits of the use, so that the use may not be enlarged beyond that warranted by the grant").

I would hold as a matter of law that the express terms of the limited, narrow grant provided by the Easement's use of the singular indefinite article "a" and the Easement's use of the adjective "said"—both describing the single, original radio transmission tower—do not include a grant of the right to build and install successive, new, bigger, taller, and wider radio transmission towers anytime lessees of

4. Maj. Op. at 886.

space on the tower request such accommodations.[5] I would therefore hold that the trial court erred in its conclusions of law to the contrary.

## B. The Easement's Habendum Clause Was Triggered When the Original Tower was Removed and Abandoned; thus, the Easement is Determinable

An easement that terminates upon the happening of a particular event or contingency is a "determinable easement." *See, e.g., Thompson v. Clayton*, 346 S.W.3d 650, 655 (Tex. App.—El Paso 2009, no pet.). The Easement's habendum clause provides that the Easement is perpetual *"until said radio transmission tower shall be abandoned and/or removed."* [All emphases added.] Thus, the Easement here is a determinable easement. *See id.* And under the plain language of the Easement's habendum clause, when "said" (i.e., the original) radio-transmission tower was removed, the Easement automatically terminated. To construe the Easement as continuing even after removal of "said" radio transmission tower eviscerates the habendum clause and its specific language making the Easement determinable and re-

writes the Easement to make it perpetual. *See ETC Tex. Pipeline, Ltd. v. Payne*, No. 10-11-00137-CV, 2011 WL 3850043, at *7 (Tex. App.—Waco Aug. 31, 2011, no pet.) (mem. op.) (declining to adopt ETC's interpretation of easement because its interpretation would make the easement perpetual and "eviscerate the eighteen-month non-use termination clause"); *Kearney & Son*, 401 S.W.2d at 905 ("To hold that a permanent easement of access across appellant's property exists by virtue of the grant in the deed violates the express language and terms of the grant and enlarges the use of the appellant's property from that stated in the express grant."); *see also Scott v. Walden*, 140 Tex. 31,165 S.W.2d 449, 451 (1942) (holding habendum clause, providing that easement "shall continue so long as the same may be necessary and required for ingress and egress[,]" could not be ignored because it manifested parties' intent that easement not be perpetual and evidence presented raised fact issue on whether easement remained necessary). Such an interpretation of the Easement violates one of the most basic rules of contract construction—it fails to give effect to an entire clause, the habendum clause.[6] *See, e.g., Heritage Res.*,

---

**5.** The majority holds that a literal singular construction of the terms "a" and "said" used in the Easement's granting clause somehow conflicts with the term "maintaining" used in the Easement's ingress/egress clause, but I see no conflict. The ingress/egress clause grants a right of access for the purpose of "maintaining ... *said* radio transmission tower." [Emphasis added.] And the Easement's habendum clause terminates the Easement when *"said* radio transmission tower shall be abandoned and/or removed." [Emphasis added.] The rights granted by the Easement are consistently tied to *"said* radio transmission tower," not to a radio transmission right-of-way or to a right to operate a radio-broadcasting network. The Easement grants the right to install one radio-transmission tower; subsequent towers require subsequently negotiated easements. *See Dwyer*, 374 S.W.2d at 665-66

(holding gas pipeline easement granted thirty years earlier for $32 did not authorize an increase in the size of the pipeline every time increased consumer demand for gas occurred).

**6.** Although "said" radio transmission tower was both abandoned and removed, the majority holds that the habendum clause was not triggered and is not rendered meaningless because it hypothetically could be triggered if said original tower is subsequently removed and not replaced or replaced when unnecessary for said tower's maintenance. *See* Maj. Op. at 888. The fallacy in this hypothetical is that "said" radio transmission tower, the original tower, is now gone forever; it cannot be again removed or abandoned, so the habendum clause now cannot be triggered and has been eviscerated.

*Inc. v. NationsBank,* 939 S.W.2d 118, 121 (Tex. 1996) (recognizing presumption that parties to a contract intend every clause to have effect); *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex. 1983) (recognizing rule of construction that entire contract will be harmonized to give effect to all provisions of the contract so that none will be rendered meaningless). We must presume that the parties to the Easement intended every clause to have some effect.

The undisputed evidence conclusively established that Campbell "abandoned and/or removed ... said radio transmission tower," that is, the original radio-transmission tower. Consequently, by its own express terms, the Easement terminated. I would therefore hold that the trial court erred in its conclusions of law to the contrary.

### C. Construction of an Entirely New Radio-Transmission Tower Does Not Constitute Maintenance of the Old Tower

In addition to the granting clause and the habendum clause, the Easement contains a clause authorizing ingress and egress over the servient estate for "the purpose of inspecting, maintaining, constructing[,] and removing *said* radio transmission tower and appurtenances." [Emphasis added.] The trial court and the majority construe this ingress-egress clause as authorizing Campbell to build an entirely new, bigger, taller, and wider radio transmission tower in a spot 18 feet from the old tower under the guise of "maintaining" the old tower.

Because the term "maintenance" is not defined in the Easement, it is to be given its ordinary and common meaning. *See Heritage Res.,* 939 S.W.2d at 121 (explaining that if a term in a conveyance is not specifically defined then that term is given its plain, ordinary, and generally accepted meaning). No definition of "maintenance"

exists that includes the destruction of the thing being maintained. Maintenance performed on a radio-transmission tower does not include tearing down and dismantling that radio-transmission tower and constructing an entirely new radio-transmission tower. *See, e.g., Parks,* 1 S.W.3d at 103 (reversing court of appeals' construction of easement because the terms "obstruction," "cut," and "cut down" were unambiguous and court's construction failed to give terms their common meanings). Even when an easement grants a general right-of-way for the operation of a gas pipeline and grants a right of ingress and egress to maintain that pipeline, to qualify as "maintenance," any replacement of the original pipe must be with pipe of the same size. *See Dwyer,* 374 S.W.2d at 664 (holding that easement for transportation of gas by pipeline that granted right to "lay, construct, maintain, operate[, and] repair" a pipeline nonetheless prohibited defendant from replacing 18-inch pipeline defendant elected to install in given location with a 30-inch, high-pressure pipeline under the guise of maintenance). Thus, here, if replacement of the original radio-transmission tower could qualify as "maintenance," *Dwyer* mandates that such replacement be with a radio transmission tower of the same size. *Id.*

The undisputed evidence here conclusively established that Campbell did not remove and replace the original radio-transmission tower with a tower of the same size. Instead, under the guise of maintenance, Campbell constructed a new, bigger, taller, and wider radio-transmission tower and placed it in a different spot—the very conduct prohibited in *Dwyer* as inconsistent with "maintenance." *Id.* at 666 ("Defendant was not authorized to remove this 18-inch line initially constructed and replace it with a line of substantially greater size."). Accordingly, I would hold that Campbell's destruction of

the original radio-transmission tower and his construction—to satisfy the needs of potential lessees like LKCM Radio Group, L.P.—of a new, bigger, taller, and wider radio-transmission tower located in a different spot does not constitute "maintenance" authorized by the Easement. *See id.* Just as the supreme court in *Dwyer* held that it did not follow from the easement's granting language that the grantor for $32 in 1926 intended to burden the servient estate with an easement that might be enlarged over and over again as often as an increase in demands for gas might make it necessary, so I would hold that it does not follow from the Easement's narrow granting language that the grantor here for $10 in 1977 intended to burden the servient estate with an easement that might be enlarged over and over again as often as an increase in tower size is demanded by potential lessees. *See id.* at 665-66.

## D. Construction of the New Radio-Transmission Tower and the Boundaries of the Easement

On rehearing, the majority holds that the construction of a new radio-transmission tower in a new spot does not alter the physical boundaries of the Easement.[7] This may or may not be true. It is, however, irrelevant. The express terms of the Easement do not authorize construction of a completely new, taller, bigger, wider radio-transmission tower regardless of whether such construction falls inside or outside the physical boundaries of the Easement. *See, e.g., Ybanez,* 98 Fed.Cl. at 667-68; *Parks,* 1

S.W.3d at 101; *Kearney & Son,* 401 S.W.2d at 905.

Even assuming the relevancy of the no-change-in-the-boundaries-of-the-Easement analysis, the majority's holding—that because Campbell's positioning of the new tower in a new location purportedly within the existing boundaries of the Easement caused no day-to-day change in Lindemann's day-to-day operations, the new tower's change in location was not "substantial"—is incompatible with Texas case law.[8] The fact that the new location of the new tower did not cause a change in Lindemann's operations does not authorize an expansion of the Easement's express terms, which are limited to "a right for the installation of a radio transmission tower." *See Corley,* 246 F.Supp.2d at 572 ("If a use does not serve the easement's express purpose, it becomes an unauthorized presence on the land whether or not it results in any noticeable burden to the servient estate ... [t]hus, the threshold inquiry is not whether the proposed use results in a material burden, but whether the grant's terms authorize the proposed use."). Texas courts do not consider whether a change in the location of an Easement is substantial; instead, once established, the location of an easement cannot be changed by either the owner of the dominant estate or the owner of the servient estate without the consent of both parties. *See, e.g., Severance,* 370 S.W.3d at 722; *Harbor Ventures, Inc. v. Dalton,* No. 03-10-00690-CV, 2012 WL 1810205, at *10 (Tex. App.—Austin May 18, 2012, pet. denied) ("Once established, the location of the easement cannot be

---

7. Maj. Op. at 885.

8. The majority cites only out-of-state cases for the proposition that the location of a fixed easement can be changed without the consent of the dominant and servient estate owners so long as the change is not "substantial." But Texas cases hold otherwise; any alteration in

the boundaries of a fixed easement requires the consent of both parties. *See, e.g., Dwyer,* 374 S.W.2d at 665-66 (rejecting construction of easement that would permit easement, once fixed, to be unilaterally enlarged over and over again); *Cozby v. Armstrong,* 205 S.W.2d 403, 407 (Tex. Civ. App.—Fort Worth 1947, writ ref'd n.r.e).

changed by either the easement owner or the servient owner without the consent of both parties.") (mem. op.); *Holmstrom v. Lee*, 26 S.W.3d 526, 533 (Tex. App.—Austin 2000, no pet.) ("Once established, the location or character of the easement cannot be changed without the consent of the parties."); *Samuelson v. Alvarado*, 847 S.W.2d 319, 323 (Tex. App.—El Paso 1993, no writ) ("Once established, the location of the easement cannot be changed by either the easement owner or the servient owner without the consent of both parties."); *Cozby v. Armstrong*, 205 S.W.2d 403, 407 (Tex. Civ. App.—Fort Worth 1947, writ ref'd n.r.e.) ("When an easement granted in indefinite terms has been once selected and located, its location cannot be changed by either the owner of the land or the owner of the easement without the consent of the other party, for it would be an incitement to litigation to treat such an easement as a shifting one, and would greatly depreciate the land on which it is charged and discourage its improvement." (quoting 15 Tex. Jur. 769)). The undisputed evidence establishes that Lindemann did not consent to the new location selected by Campbell for the building of the entirely new, bigger, taller, and wider radio-transmission tower.

## VII. CONCLUSION

For the reasons set forth above, I would hold that the trial court's conclusions of law—that the scope of the Easement was not violated, that the construction of the new radio-transmission tower was maintenance of the original tower, that the original tower was not abandoned, and that the Easement did not automatically terminate—were erroneous as a matter of law. I would sustain Lindemann's first three issues, reverse the trial court's judgment for Campbell—including the award of attorney's fees (mooting Lindemann's fifth issue), render a judgment for Lindemann declaring that the Easement automatically terminated under its terms, and remand the case to the trial court to address Lindemann's claim for injunctive relief (its fourth issue) and Lindemann's claim for attorney's fees. Because the majority does not, I am compelled to dissent.

## APPENDIX A

### NO. 2013-0050A-CV

**LINDEMANN PROPERTIES, LTD., Plaintiff,**

**V.**

**WARD A. CAMPBELL, Defendant.**

**IN THE DISTRICT COURT, 97TH JUDICIAL DISTRICT OF ARCHER COUNTY, TEXAS**

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

**NOW COMES** the Court, having heard the evidence and argument of counsel in this cause and makes the following findings of fact and conclusions of law listed below. To the extent any findings of fact are deemed to be conclusions of law, they are incorporated herein as conclusion of law. To the extent that any conclusions of law are deemed to be findings of fact, they are incorporated herein as findings of fact.

### I.

#### Findings of Fact

1. On or about March 7, 1977, Howell E. Smith d/b/a Muleshoe Cattle Company granted an casement (the "Easement") to A.O.Campbell, Jr.

2. A true and correct copy of the instrument that created the Easement (the "Easement Instrument") referenced in Paragraph 1, above, was admitted into evidence during the trial of this cause on June 29, 2015, as Plaintiff's Exhibit 1, and is attached hereto as Exhibit A.

3. Defendant Ward A. Campbell ("Campbell" or "Defendant") is A.O. Campbell, Jr.'s son and succeeded to A.O. Campbell, Jr.'s interest in the Easement.

4. Defendant held a valid Easement on the Property for the purpose of installing a radio tower and guy wires necessary to support the same.

5. Lindemann Properties, Ltd. ("Lindemann" or "Plaintiff") acquired title to the Property (defined below in Paragraph 7) in 2009, subject to the Easement.

6. The Easement Instrument states that it granted "an easement or right for the installation of a radio transmission tower, consisting of the tower itself and guy wires as necessary to support the same."

7. The Easement Instrument states that "said radio transmission tower will be located on a tract 500 feet by 500 feet" (the "Tract") within a larger area described as "Lot No. One (1), Block No. Seventy-five (75) ATNC Subdivision, Archer County, Texas." "Lot No. One (1), Block No. Seventy-five (75) ATNC Subdivision, Archer County, Texas," is referred to herein as the "Property."

8. The Easement Instrument granted "the right of ingress and egress over my adjacent lands to or from said easement for the purpose of inspecting, maintaining, constructing and removing said radio transmission tower and appurtenances."

9. The boundaries of the Tract would be determined by the location of the tower itself, with the center of the Tract being the site of the tower.

10. The Easement would remain in existence perpetually, until said radio transmission tower should be abandoned and/or removed.

11. A radio transmission tower (the "Original Tower") was constructed within the Tract in 1977.

12. The Original Tower was enclosed by a pipe fence since the 1970's.

13. The Original Tower remained standing until it was replaced and removed in 2012 due to evidence of structural instability.

14. The Original Tower was standing while a replacement tower (the "New Tower") was constructed on the Tract.

15. The New Tower was constructed within the same pipe-fenced enclosure as the Original Tower.

16. Replacement of the Original Tower was necessary to maintain a functional tower in the Tract.

17. The Original Tower was removed after it was replaced by the New Tower.

18. The Original Tower was removed as soon as was practicable after all transmission equipment was relocated to the New Tower.

19. The Original Tower was removed only after it was no longer transmitting.

20. The New Tower does not increase the burden on the surface estate.

21. The New Tower does not exceed the scope of the Easement.

22. The building of the New Tower does not effect a termination of the Easement.

23. No actions of Defendant in connection with the maintenance of the Easement effected a termination of the Easement.

24. The Easement has not terminated and is still in existence.

25. $51,763.75 is a reasonable fee for the necessary services performed by Defendant's attorneys through the trial court phase of this case.

26. Defendant incurred $4,342.44 in reasonable and necessary expenses through the trial court phase of this case.

27. Exhibit 29 was offered by Plaintiff.

28. Exhibit 29 was Defendant's list of revenue received from both the Original and New Towers.

29. $25,000 is a reasonable fee for the necessary services to be performed by Defendant's attorneys if there is an appeal to the Court of Appeals.

30. $10,000 is a reasonable fee for the necessary services to be performed by Defendant's attorneys if a Petition for Review is filed with the Texas Supreme Court.

31. $20,000 is a reasonable fee for the necessary services to be performed by Defendant's attorneys if the Texas Supreme Court grants the Petition for Review.

## II.

### Conclusions of Law

1. The award of $51,106.19 in attorney's fees to Defendant is equitable and just.

2. The award of $4,342.44 in reasonable and necessary expenses to Defendant is equitable and just.

3. The award of $25,000 in attorney's fees to Defendant if there is an appeal to the Court of Appeals is equitable and just.

4. The award of $10,000 in attorney's fees to Defendant if a Petition for Review is filed with the Texas Supreme Court is equitable and just.

5. The award of $20,000 in attorney's fees to Defendant if the Texas Supreme Court grants the Petition for Review is equitable and just.

6. Necessary legal services performed for Defendant on Lindemann's trespass claim are indistinguishable from necessary legal services performed for Defendant to create and sustain its arguments regarding the surface burden of the Original and New Towers.

7. The New Tower does not increase the burden on the surface estate.

8. The New Tower does not exceed the scope of the Easement.

9. The building of the New Tower does not effect a termination of the Easement.

10. Defendant's Easement included the right to maintain the radio transmission tower on the Tract.

11. Defendant's right to maintain included his right to replace the Original Tower with the New Tower.

12. The removal of the Original Tower after replacement with the New Tower does not effect a termination of the Easement.

13. The Original Tower was not abandoned; it was replaced.

14. No actions of Campbell in connection with the maintenance of the Easement effected a termination of the Easement.

15. The Easement has not terminated and is still in existence.

16. Exhibit 29 as offered by Plaintiff at trial was not relevant to the issues before the Court.

Signed this 12 day of November, 2015.
/s/ Jack A. McGaughey
Judge Presiding