**Opinion filed July 31, 2025**



In The

# Eleventh Court of Appeals

_____

## No. 11-24-00149-CV
_____

## AEP TEXAS INC., Appellant

## V.

## WILKS RANCH TEXAS, LTD.; DANIEL H. WILKS; STACI WILKS; AND FARJO RANCH LLC, Appellees

**On Appeal from the 91st District Court**
**Eastland County, Texas**
**Trial Court Cause No. CV-2246425**

### O P I N I O N

This case presents the question of whether Appellant, AEP Texas Inc. (AEP), pursuant to rights granted under 1927 easements, is permitted to replace the existing wooden H-frame electric transmission structures with taller steel monopoles on land owned by Appellees, Wilks Ranch Texas, Ltd., Daniel H. Wilks, Staci Wilks, and Farjo Ranch LLC (Wilks). Wilks filed suit against AEP for declaratory and

injunctive relief seeking to prevent AEP from replacing the structures within the easements. The trial court granted summary judgment in favor of Wilks, declared that the easements do not permit AEP to change the materials and height of the structures, and awarded Wilks attorney's fees and costs. In two issues, AEP argues that the trial court erred in: (1) declaring that the easements do not allow AEP to upgrade its poles and fixtures in support of the transmission line easement; and (2) awarding Wilks costs and attorney's fees. We reverse and render in part and reverse and remand in part.

*Factual and Procedural History*

In 1927, West Texas Utilities Company (WTU) acquired easements in Callahan and Eastland counties for an electric transmission line. The easements shared the following pertinent language:

> [Grantors] for and in consideration of the sum of Fifty dollars ($50.00) dollars [sic], . . . paid by [WTU], . . . do hereby bargain sell and convey unto the said [WTU], its successors and assigns, an easement and right of way across [property description], with the *right to construct[,] operate, patrol, maintain[,] and repair its transmission line, including easement for said purposes, and including necessary poles, and fixtures,* and authority for cutting and trimming all trees along the line necessary to keep the wires cleared and with the right to set the necessary guy and brace poles and attach to trees and to maintain the needed guy wires, together with the right of ingress and egress across said property for the above named purposes.

(Emphasis added). A description for the path of the right-of-way is included in each easement, without specifying a fixed width for the easement. Of the six easements, five do not limit the number of pole locations that may be placed, while the sixth limits the number to eleven, with an allowance for more upon the payment of additional consideration. While the language of the easements does not limit the transmission line construction in material or height, WTU initially built wooden H-frame structures on the property that were approximately 54-feet above ground

and operated at 69 kilovolts. Years later, Wilks acquired the property encumbered by the easements. In 2021, AEP, the present easement holder, announced its intention to "modernize" the transmission line by replacing the wooden H-frame structures with single 65-foot steel poles, improved conductors, and new wires. AEP asserted that the project would improve electric service reliability in the area.

Prior to construction, Wilks sued AEP for declaratory and injunctive relief, and the recovery of attorney's fees. Wilks sought a declaration that the plain language of the easements provides AEP's range of permissible activities but does not include allowing AEP to *reconstruct* the transmission line. Alternatively, Wilks sought a declaration that the easements were ambiguous and should be strictly construed against the grantee, and that "AEP may only replace the [current] wooden H-frame structures with new wooden H-frame structures of like height[,] build[,] and wires limited to handling 69kV." Wilks sought injunctive relief "to prevent the violation of the easement that would result" if AEP were permitted to proceed with the project.

Following a hearing, the trial court granted a temporary injunction enjoining AEP from:

> (1) [R]emoving the existing 45-foot wooden H-frame structures on the land covered by the 1927 Easements; or (2) installing structures on the land covered by the 1927 Easements that are not of the same height, spacing, and material as the existing 45-foot wooden H-frame structures and conductors that are not of the same thickness as the existing conductors.

AEP filed an interlocutory appeal with this court, which we dismissed as moot after the trial court entered a final judgment prior to our consideration of the merits. *AEP Tex. Inc. v. Wilks Ranch Tex., Ltd.*, No. 11-22-00306-CV, 2024 WL 2335837 (Tex. App.—Eastland May 23, 2024, no pet.) (mem. op.). While that appeal was pending, Wilks filed a motion for partial summary judgment in the trial court on its claim for

a declaration that the easements are unambiguous and "do not allow AEP to reconstruct the transmission line with larger, steel monopoles and wires of a thicker diameter." Accordingly, Wilks's position has consistently been that the easement language allows the replacement of poles and fixtures but not with new materials or of increased height.

AEP filed an amended answer and alternative cross-bill for condemnation; but AEP later nonsuited its alternative cross-bill. *See* TEX. PROP. CODE ANN. § 21.017(a) (West 2025). AEP also filed a motion to strike Exhibits D, E, and F to Wilks's motion for partial summary judgment, arguing that the exhibits constituted inadmissible extrinsic evidence intended to vary the meaning of an unambiguous written instrument. Those exhibits were of testimony from the temporary injunction hearing and two expert reports. The experts offered opinions regarding the good working order of the transmission line's current structures and that one reason that AEP intended to replace them was to increase its profits.

AEP then filed a response to Wilks's motion as well as its own motion for partial summary judgment. In both pleadings, AEP argued that the easements unambiguously permitted it to proceed with the improvements—to construct, operate, repair, and maintain a transmission line, specifically "including [the] necessary poles, and fixtures." AEP argued that "[a]bsent express limitations on use, broad language like that in the 1927 [e]asements confers the right to change use as reasonably necessary over time." Wilks filed a response to AEP's motion for partial summary judgment, to which AEP filed a reply, as well as a reply in support of its own motion.

The trial court denied AEP's motion to strike the exhibits and granted Wilks's motion for partial summary judgment. Following a hearing on Wilks's motion for attorney's fees, the trial court signed a final judgment incorporating its earlier summary judgment ruling, declaring "that the 1927 Easements require that if the

4

Defendant reconstructs the existing wooden H-frame support structures and wires on Plaintiffs' properties it must do so with support structures of the same height and material and the same diameter wires[,]" and awarding Wilks $471,064.33 in attorney's fees, as well as costs and contingent appellate attorney's fees.  This appeal followed.

*Standard of Review – Summary Judgments*

We review a trial court's grant of summary judgment de novo.  *Fort Worth Transp. Auth. v. Rodriguez*, 547 S.W.3d 830, 837 (Tex. 2018).  To prevail under the traditional summary judgment standard, the movant has the burden to establish that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  TEX. R. CIV. P. 166a(a), (c); *ConocoPhillips Co. v. Koopmann*, 547 S.W.3d 858, 865 (Tex. 2018). If the movant meets its summary judgment burden, the burden shifts to the nonmovant to raise a genuine issue of material fact that would preclude the grant of summary judgment.  *Amedisys, Inc. v. Kingwood Home Health Care, LLC,* 437 S.W.3d 507, 510–11 (Tex. 2014).

To determine if a genuine issue of material fact exists, we review the evidence in the light most favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor.  *KMS Retail Rowlett, LP v. City of Rowlett*, 593 S.W.3d 175, 181 (Tex. 2019).  We credit evidence favorable to the nonmovant if reasonable jurors could do so, and we disregard contrary evidence unless reasonable jurors could not.  *Samson Expl., LLC v. T.S. Reed Props., Inc.*, 521 S.W.3d 766, 774 (Tex. 2017); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009).  The evidence raises a genuine issue of material fact if reasonable and fair-minded factfinders could differ in their conclusions in light of all of the summary judgment evidence presented.  *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 755 (Tex. 2007).

Here, the parties filed competing motions for summary judgment. When cross-motions for summary judgment are filed, each party bears the burden to establish that it is entitled to judgment as a matter of law. *City of Garland v. Dallas Morning News*, 22 S.W.3d 351, 356 (Tex. 2000). Thus, when the trial court grants one motion and denies the other, we must consider all of the summary judgment evidence, determine all questions presented, and render the judgment that the trial court should have rendered. *Lightning Oil Co. v. Anadarko E&P Onshore, LLC*, 520 S.W.3d 39, 45 (Tex. 2017) (citing *Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 248 (Tex. 2013)).

"A trial court's decision to consider evidence—or not—on summary judgment is reviewed for an abuse of discretion." *State v. Three Thousand, Seven Hundred Seventy-Four Dollars & Twenty-Eight Cents U.S. Currency*, 713 S.W.3d 381, 387 (Tex. 2025) (citing *Lujan v. Navistar*, 555 S.W.3d 79, 84–85 (Tex. 2018)). An appellate court must uphold the trial court's evidentiary ruling if there is any legitimate basis for the ruling. *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998). Unless the trial court's erroneous evidentiary ruling probably caused the rendition of an improper judgment, we will not reverse the ruling. *Id.*; *see* TEX. R. APP. P. 44.1.

*Interpretation of Easements*

In its first issue, AEP argues that the trial court erred "in declaring that the 1927 easements unambiguously do not authorize [AEP] to upgrade an existing transmission line."

A. *Generally*

"An easement is a non-possessory property interest that authorizes its holder to use the property of another for a particular purpose." *Severance v. Patterson*, 370 S.W.3d 705, 736 (Tex. 2012); *see Marcus Cable Assocs., L.P. v. Krohn*, 90 S.W.3d 697, 700 (Tex. 2002). "We apply basic principles of contract construction and

6

interpretation when considering an express easement's terms." *Marcus Cable*, 90 S.W.3d at 700 (citing *DeWitt Cnty. Elec. Coop., Inc. v. Parks*, 1 S.W.3d 96, 100 (Tex. 1999)). The "starting point" is "the easement's plain language." *Southwestern Elec. Power Co. v. Lynch*, 595 S.W.3d 678, 689 (Tex. 2020) (*SWEPCO*) (citing *Marcus Cable*, 90 S.W.3d at 700). "The contracting parties' intentions, as expressed in the grant, determine the scope of the conveyed interest." *Marcus Cable*, 90 S.W.3d at 700–01 (citing *DeWitt*, 1 S.W.3d at 103). "When the grant's terms are not specifically defined, they should be given their plain, ordinary, and generally accepted meaning." *Id.* at 701 (citing *DeWitt*, 1 S.W.3d at 101). "[U]nless the language is ambiguous, we rely solely on the written instrument." *Atmos Energy Corp. v. Paul*, 598 S.W.3d 431, 444 (Tex. App.—Fort Worth 2020, no pet.) (citing *Smith v. Huston*, 251 S.W.3d 808, 823 (Tex. App.—Fort Worth 2008, pet. denied)). When a court concludes that the contract language can be given a certain or definite meaning, the language is not ambiguous, and the court must interpret the contract as a matter of law. *SWEPCO*, 595 S.W.3d at 686 (citing *DeWitt*, 1 S.W.3d at 100). An ambiguity does not arise merely because parties to an agreement disagree as to its interpretation. *Id.* (citing *DeWitt*, 1 S.W.3d at 100). It arises only after the application of established rules of construction leaves an agreement susceptible to more than one meaning. *Id.* (citing *DeWitt*, 1 S.W.3d at 100).

### B. *Accommodation of Improvements Over Time*

"A grant or reservation of an easement in general terms implies a grant of unlimited reasonable use such as is reasonably necessary and convenient and as little burdensome as possible to the servient owner." *Coleman v. Forister*, 514 S.W.2d 899, 903 (Tex. 1974). "[T]he threshold inquiry is not whether the proposed use results in a material burden, but whether the grant's terms authorize the proposed use." *Marcus Cable*, 90 S.W.3d at 703. "An easement's express terms, interpreted according to their generally accepted meaning, therefore delineate the purposes for

7

which the easement holder may use the property." *Id.* at 701 (first citing *DeWitt,* 1 S.W.3d at 100, 103; and then citing *Coleman,* 514 S.W.2d at 903).

"The common law does allow some flexibility in determining an easement holder's rights." *Marcus Cable*, 90 S.W.3d at 701. "In particular, the manner, frequency, and intensity of an easement's use may change over time to accommodate technological development." *Id.* (citing RESTATEMENT (THIRD) OF PROPERTY (SERVITUDES) § 4.10 (AM. L. INST. 2000)). "But such changes must fall within the purposes for which the easement was created, as determined by the grant's terms." *Id.* Thus, "an express easement encompasses only those technological developments that further the particular purpose for which the easement was granted." *Id.* at 702; *see City Pub. Serv. Bd. of San Antonio v. Karp*, 585 S.W.2d 838, 841 (Tex. App.— San Antonio 1979, no writ) ("The creation of an easement involves looking forward by those participating in its creation, to a future use by the dominant tenant that is not inconsistent with or repugnant to the creating instrument."); *Cent. Power & Light Co. v. Holloway*, 431 S.W.2d 436, 439–40 (Tex. App.—Corpus Christi–Edinburg 1968, no writ) ("By the terms of the easement itself it is evident that the parties were looking to the future, since future contingencies were provided for in the instrument."). Importantly, "[a] grant may authorize a use greater than the one actually used, and such prior use does not nullify the greater rights conveyed in the grant." *Atmos Energy*, 598 S.W.3d at 452.

C. *Analysis Regarding the AEP/Wilks Easement*

1. *Party Positions*

The parties agree that the terms of the 1927 easements are not ambiguous. We conclude that the easement terms, while broad, are not ambiguous. The parties stipulated that: AEP is the successor-in-interest to WTU's (the original grantee) rights under the 1927 easements; the height of AEP's wooden H-frame structures currently on Wilks's properties are, on average, approximately 54' above ground;

8

and the height of the steel monopoles that AEP intends to reconstruct on Wilks's properties will be, on average, approximately 72' above ground.

In his unsworn declaration, Wilks's expert and professional engineer Rex N. Woods establishes that the wooden poles had not been replaced since 1980, over forty years ago, but some were replaced in 2011 and 2022 and three of the poles were currently not in good working condition.

Wilks contends that verbiage in the lease including "construct," "maintain" and "repair" do not permit AEP's "modernization" of the entire transmission line. Wilks ostensibly rejects a type of forty-year upgrade of the materials for the entire line. Rather, pole and fixture replacement would be permitted piecemeal under the easement only when current working conditions of the equipment are lessened and make it necessary to do so.

Proactive upgrading of existing working parts before they fail would logically appear to be a prudent way to *maintain* the secure crossing of the transmission line over the property where an easement has been granted and where crossing is the purpose of the easement. The intent to make provision for future accommodations in the easement's use is found in the use of words like "patrol[ing]" and "maintain[ing]," which contemplate proactive action before failure occurs, specifically for "poles[] and fixtures." The broad easement terms "operate," "patrol," "maintain," "repair" and even "construct" do not necessarily begin and end as of 1927, which by its argument Wilks concedes, *except* as to the word "construct." The easement language does not preclude, and we agree with AEP that doing what is necessary in order to "maintain" uninterrupted viability of a transmission line may include, proactive measures.[1]

---

[1]Wilks did not challenge the reasonableness or necessity of AEP's modernization project, and they did not plead that AEP's modernization plan was somehow unreasonable or unnecessary. We may not sustain the district court's judgment on a ground not pled for in Wilks's motion. *See Stephens v. Three Finger Black Shale P'ship*, 580 S.W.3d 687, 705 (Tex. App.—Eastland 2019, pet. denied).

As stated above, the broad easement language chosen gives AEP the "right to construct[,] operate, patrol, maintain[,] and repair its transmission line, including easement for said purposes, and including necessary poles, and fixtures." According to AEP, the easements permit it to construct a transmission line without express limitations, which means that it can replace its structures with a more modern design and different materials. Wilks responds that the easements' omission of "fresh start" language such as "reconstruct," "reconfigure," "rebuild," "remove," "replace," or "redesign" means that AEP may not "remove existing structures and start over."

### 2. *Texas Caselaw Construing Easements*

The Texas Supreme Court recently addressed the scope of permitted uses of an easement in *SWEPCO*. 595 S.W.3d at 684–91. In that case, the easement holder undertook a modernization project of its electrical transmission lines that required replacing the line's wooden poles with steel ones. *Id.* at 681. Affected landowners filed suit, seeking to limit the easements to a thirty-foot right-of-way, although the easements did not contain such a restriction. *Id.* The easements provided that the holder had the right of ingress and egress over the encumbered properties "for the purpose of constructing, reconstructing, inspecting, patrolling, hanging new wires on, maintaining and removing said line and appurtenances." *Id.* The easements' right-of-way ran along a set course but did not have a fixed width. *Id.* at 680.

The supreme court explained that the case was similar to *Knox v. Pioneer Natural Gas Company*, 321 S.W.2d 596 (Tex. App.—El Paso 1959, writ ref'd n.r.e.). *Id.* at 688. In *Knox*, a utility company had obtained an easement that included a right-of-way

> of sufficient width to permit the grantee to lay, maintain, operate and remove a pipe line for the transportation of gas . . . together with free ingress, egress, and regress to and for the said grantee, and his or its agents, employees, workmen and representatives, as by it, he or them shall be necessary or convenient, at all times and seasons forever, in,

10

along, upon and across said way, in common with the grantors, their tenants and assigns.

321 S.W.2d at 598. The utility company replaced its pipeline with a new, larger capacity line. *Id.* at 599. The El Paso Court of Appeals determined that the utility company was not limited to the specifications of the old line, reasoning that "if the language of the grant clearly gives the grantee a right in excess of the one actually used, *such right would still exist notwithstanding the exercise of a lesser privilege.*" *Id.* at 600 (emphasis added). The court noted that express easements by conveyance are, by their very nature, forward-looking and that it is "assumed that the parties contemplated changes in the use of the servient tenement by the normal development in the use of the dominant tenement." *Id.* at 601 (citation omitted). The court also stated that the utility company's replacement of the line with a larger one was permitted because there was no express limitation in the easement on the size of the pipe. *Id.* at 601–02. The *SWEPCO* court noted that, like *Knox*, the subject easement gave its holder "the right to construct, maintain, repair, and improve a utility line," which "contemplates future construction and installation." 595 S.W.3d at 688–89.

Wilks's arguments rely heavily on *Houston Pipe Line Company v. Dwyer*, 374 S.W.2d 662 (Tex. 1964). But the *Dwyer* decision is based on a narrow set of facts, and its holding is of limited application. In *SWEPCO,* the supreme court distinguished *Dwyer*, where the easement was granted for the purpose of "laying, constructing, maintaining, operating and repairing a pipeline." *SWEPCO*, 595 S.W.3d at 687 (quoting *Dwyer*, 374 S.W.2d at 665). The affected landowners sought to prevent a pipeline company from enlarging the pipe from eighteen to thirty inches. *Dwyer*, 374 S.W.2d at 663. In its analysis, the supreme court had considered terms the parties had noticeably *deleted* from the agreement such as the right to "remove" and construct additional pipelines and the absence of any metes and bounds

11

description for the easement. *Id.* at 663–64. Given those facts, the court held that the following rule was applicable to the easement:

> A grant in general terms of a right to lay a pipe for the purpose of conducting water across the land of the grantor without specifying the place for laying it or the size of the pipe is defined and made certain by the act of the grantee in laying down the pipe; and after he has once laid the pipe with the acquiescence of the grantor, the grant which was before general and indefinite becomes fixed and certain and the grantee cannot change the easement either by relaying the pipe in another place or by increasing its size.

*Id.* at 666 (quoting THOMPSON ON REAL PROPERTY (Perm. Ed.) § 681). Accordingly, the court held that the extent of the pipeline company's easement rights had become fixed and certain when it constructed the initial pipeline, such that it could not later enlarge its size. *Id.*

Importantly, the *SWEPCO* court noted that the easement in *Dwyer* did not include broad, forward-looking language and did not describe a path for the pipeline. 595 S.W.3d at 689 (citing *Dwyer*, 374 S.W.2d at 663). In contrast:

> SWEPCO acquired general easements over the Landowners' properties. These easements describe a range of authorized activities and rights granted to SWEPCO for specific purposes relating to a transmission line. The plain language of the easements does not include a fixed width for the easements, nor were the easements required to do so.

*Id.* at 691. The court therefore held that the easement was not limited to a thirty-foot width and therefore could be enlarged per the easement terms. *Id.*

There are several cases in which our sister courts have construed an easement's language to permit the reconstruction of structures to accommodate changes in technology, increased demand for services, and reliability. *See, e.g., Lindemann Properties, Ltd. v. Campbell*, 524 S.W.3d 873, 883–84 (Tex. App.—Fort Worth 2017, pet. denied) (holding that the use of word "maintaining" in an easement

12

permitted easement holder to replace radio transmission tower with a taller and wider one); *Lower Colorado River Auth. v. Ashby*, 530 S.W.2d 628, 632–33 (Tex. App.—Austin 1975, writ ref'd n.r.e.) (holding that an easement that allowed for constructing, reconstructing, maintaining, and removing electric transmission line permitted easement holder to replace wooden structures with steel towers to increase electrical load); *Holloway*, 431 S.W.2d at 438–40 (holding that an easement's use of the terms constructing, reconstructing, inspecting, patrolling, maintaining, removing, and relocate permitted the easement holder to replace poles by increasing the height of the line by fifteen feet); *Pedernales Elec. Coop., Inc. v. White*, No. 03-22-00797-CV, 2024 WL 5058720, *5–6 (Tex. App.—Austin Dec. 11, 2024, pet. filed) (mem. op.) (concluding that an easement that allowed for the constructing, reconstructing, inspecting, patrolling, hanging new wire, maintaining, and removing, and relocating permitted utility company to replace wooden poles with taller steel poles); *Premcor Pipeline Co. v. Wingate*, No. 09-22-00117-CV, 2024 WL 1565334, *11–12 (Tex. App.—Beaumont Apr. 11, 2024, no pet.) (mem. op.) (holding that an easement that authorized a gas company to construct, maintain, lay, repair, renew, change the size of, restore, and remove pipeline did not fix the boundary of the easement upon laying of the original pipeline); *Voges v. Lower Colorado River Auth.*, No. 03-97-00561-CV, 1999 WL 66205, *5–7 (Tex. App.—Austin Feb. 11, 1999, no pet.) (holding that an easement that provided for the constructing, reconstructing, repairing, operating, maintaining, and removing of electric transmission line permitted easement holder to upgrade its transmission line by removing wooden structures and installing concrete poles).

### 3. *The Absence of Words Using "Re" as a Prefix*

Wilks distinguishes these cases by focusing on the absence of terms within the easement's language such as "reconstruct," "reconfigure," "rebuild," "remove," "replace," or "redesign." Wilks argues that in the absence of such language, *Dwyer*

13

controls, and AEP may only replace its transmission line towers with towers of identical size and makeup to that constructed on the subject property in 1927. We disagree. Here, when broad verbiage in the conveyance, like "construct," is chosen by the parties, we do not rely merely on the absence of a prefix to be determinative or to limit our construction of the easement grant.

As we have said, "[w]hen a court concludes that contract language can be given a certain or definite meaning, then the language is not ambiguous, and the court is obligated to interpret the contract as a matter of law." *SWEPCO*, 595 S.W.3d at 686 (quoting *DeWitt*, 1 S.W.3d at 101). "As in contract interpretation cases, courts look to all of the language in the easement and harmonize its terms to give effect to all of the provisions." *Id.*; *DeWitt*, 1 S.W.3d at 101 (looking to multiple portions of an easement to give effect to the agreement's intent).

*Lindemann* is instructive in the construction of terms like those of the easement at issue and our application, if any, of *Dwyer*. There, an easement authorized a single radio tower in a fixed space but did not specify the materials or design for the tower. 524 S.W.3d at 876. Thirty-five years later, the easement holder constructed a new tower that was eighteen feet away with different dimensions. *Id.* at 877, 886. The landowner sought a declaration that the easement terminated when the original tower was removed. *Id.* at 878–79. The court explained that "the relevant inquiry is whether the easement authorized the use and not whether the servient estate suffered any more or less burden." *Id.* at 889. The court held that the easement's use of the term "maintain" permitted the removal and replacement of the entire tower as necessary. *Id.* at 883; *see Ashby,* 530 S.W.2d at 632 (concluding that "the appellant's right to 'maintain' would include the right to completely remove and rebuild the transmission line in whatever manner and form authorized by the easement"). As the supreme court had in *SWEPCO*, the Fort Worth Court of Appeals in *Lindemann* distinguished *Dwyer* by noting that, in that case, the court was

14

concerned with how increasing the size of an installation affects the dimensions of an easement when the granting instrument does not provide a mete and bounds description or a fixed path for the right-of-way. *Lindemann*, 524 S.W.3d at 885 ("In *Dwyer*, the supreme court was principally concerned not with the mere fact that Houston Pipe Line increased the width of its pipeline but rather with *the effect* that increasing the size of the pipeline had on the easement's boundaries and limits. Specifically, the [Dwyer] easement did 'not prescribe metes and bounds for the easement, nor d[id] it define a course or direction for the pipe to follow across the land.'" (quoting *Dwyer*, 374 S.W.2d at 663)). Therefore, it concluded that *Dwyer* was not controlling. *Id.* Several courts have similarly distinguished *Dwyer* in declining to restrict the use of an easement. *See, e.g.*, *Premcor Pipeline*, 2024 WL 1565334, at *13; *Voges*, 1999 WL 66205, at *6; *Ashby*, 530 S.W.2d at 632.

### 4. *Considerations Regarding the Full Enjoyment of the Easement*

On the transmission line transversing the property of Wilks, the Putnam-Leon transmission line, there had been thirty-nine reported outages. Notably for one reported outage on March 5, 2023—though "unclear"—Woods could not exclude the fact that the H-frame structures or wires may have caused that outage. Wilks's expert, James Daniel, opined that upgrading the transmission line would merely increase AEP's profits by tax depreciation benefits and increasing charges to ratepayers or customers, but there is no authority given that the potential benefit of continued profitability cannot be weighed on the scales of a "right to do such things as are *reasonably necessary* for the full enjoyment of the easement." *See Lindemann*, 524 S.W.3d at 883 (quoting *Holloway*, 431 S.W.2d at 439); *see also SWEPCO*, 595 S.W.3d at 690; *Knox*, 321 S.W.2d at 601; *Karp*, 585 S.W.2d at 841. We find nothing in the record including the reports of Wilks's experts that directly contests AEP's representation that the proposed line will "modernize the structures, conductors, and wires that make up the line to improve electric service reliability"

from the original 1927 construction and "will be primarily constructed on single-pole galvanized steel structures with 795 ACSS 'Drake' conductors," which would "provide[] for more power carrying capacity than the prior conductor, and optical ground wire (OPGW)." Wilks relies primarily on the contention that the proposed upgrade is not authorized by the easement terms. *But see Karp*, 585 S.W.2d at 841 ("In the absence of language specifically negativing it, it will be assumed that the parties contemplated changes in the use of the servient tenement made necessary by the normal development in the use of the dominant tenement.") (citation omitted).

### 5. *The Purposes of the Easement are Preeminent in Accommodation of Changes in the Manner of Use*

It is not insignificant that the language of the easements grants AEP the right to cross the property with "its transmission line . . . including . . . necessary poles, and fixtures . . . with the right to set the necessary guy wires and brace poles . . . together with the right of ingress and egress . . . for the above named purposes." This language embraces the continued furtherance of the easements' purpose—that of crossing the property with a transmission line. "[T]he appropriate inquiry focuses on the replaced object's effect on the easement's boundaries, if any, not on the mere increase in the replaced object's size." *Lindemann*, 524 S.W.3d at 888.

Even though specific contractual easement terms are not violated, and the purposes of the easement are not exceeded by AEP's proposed upgrades, Wilks argues that historical use of the poles and equipment previously selected to cross the property with the transmission line somehow restricts the future use and enjoyment of the easement. We reject that contention, as the Texas Supreme Court did in *SWEPCO*. In *SWEPCO*, the easement was a general easement, and the "historical use" thereof could not impose unstated limits on its continued use. 595 S.W.3d at 689. We see no reason to disturb Texas's long-standing treatment of general easements. *Id.* We must not supplant the easement's express terms with unstated

16

additional terms or limits. *Id.* AEP is "entitled to use the servient estate in a manner that is reasonably necessary for the convenient enjoyment of the servitude." *Id.* at 690 (quoting RESTATEMENT (THIRD) OF PROPERTY (SERVITUDES) § 4.10 (AM. L. INST. 2000)).

While Wilks's post-submission argument is that AEP's proposed use is not permitted under the easement because it would "materially increase the burden on the servient estate by significantly increasing the height of the structures," the relevant inquiry is whether the easement language authorizes the use. *See Marcus Cable*, 90 S.W.3d at 703 (The threshold inquiry is whether the grant's terms authorized the proposed use, not whether such use results in a material burden.). In any event, the proposed exchange of a steel structure for the existing wooden structure and the proposed increase in height does not change or expand the purpose for which the original easement had been granted and does not increase any "burden" upon the servient estate other than as could have been imposed when the transmission lines were originally constructed. *See Lindemann*, 524 S.W.3d at 885 (increased height and width or increased girth of materials made "no effect whatsoever" on the stated limits of the easement). Had the holder of the dominant easement estate originally constructed the lines as AEP now proposes, nothing in the easement provisions would have prohibited that construction. "A grant may authorize a use greater than the one actually used, and such prior use does not nullify the greater rights conveyed in the grant." *Atmos Energy*, 598 S.W.3d at 452 (citing *SWEPCO*, 595 S.W.3d at 687–88). The record does not include evidence of how exactly the proposed modernization of the transmission line project would be an increased burden upon them and actually interfere with Wilks's use of the property. As a practical matter, while the height would increase, it appears from description and photographs in the record that the width used within the easement of a single pole would be lessened from that of the existing H-frame two pole with crossbars

17

structure. Galvanized steel poles of the height proposed by AEP for transmission lines is consistent with the implied grant of the easements, a reasonable use, convenient, and overall, of little added burden, if any, to the servient owner. *SWEPCO*, 595 S.W.3d at 690.

Like in *Lindemann*, AEP's proposed changes to the structures do not contradict an express limitation in the easements. Further, such changes fall within the purpose for which the easement was created—the transmission of electricity. *See Marcus Cable*, 90 S.W.3d at 701. The original grant of an easement along a fixed course for such use with the "right to construct[,] operate, patrol, maintain[,] and repair its transmission line, including easement for said purposes, and including necessary poles, and fixtures" is forward looking in nature, such that it allows for "the manner, frequency, and intensity of [its] use [to] change over time to accommodate technological development." *Id.*

For the foregoing reasons, we conclude that the easements do not prohibit AEP from upgrading its existing wooden H-frame electric transmission structures with taller steel ones along with the proposed fixtures. *See SWEPCO*, 595 S.W.3d at 686. Accordingly, we hold that the trial court erred in rendering judgment to the contrary. *See id.* at 691; *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). We sustain AEP's first issue.

### *Attorney's Fees and Costs*

In its second issue, AEP contends that with vindication of its proposed use of the easement, the trial court's award of attorney's fees and costs "should be reversed because it is unreasonable, unnecessary, inequitable, and unjust.

In a declaratory judgment action, attorney's fees and costs may be awarded as are "equitable and just." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 37.009 (West 2020). Because we have reversed that portion of the trial court's judgment declaring "that the 1927 Easements require that if the Defendant reconstructs the existing

18

wooden H-frame support structures and wires on Plaintiffs' properties it must do so with support structures of the same height and material and the same diameter wires[,]" we also reverse the trial court's award of attorney's fees and costs and remand that issue to the trial court to determine what award of attorney's fees and costs to any party, if any, is "equitable and just" in light of our holding. *See Bd. of Med. Examiners v. Nzedu*, 228 S.W.3d 264, 276 (Tex. App.—Austin 2007, pet. denied). We sustain AEP's second issue.

*This Court's Ruling*

We reverse that portion of the trial court's judgment granting Wilks's motion for partial summary judgment and render judgment granting AEP's motion for partial summary judgment on Wilks's claim for declaratory relief, and we remand for further proceedings consistent with this opinion.


W. BRUCE WILLIAMS

JUSTICE


July 31, 2025

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.